GUILLOT, Plaintiff, *v.* STATE HIGHWAY COMMISSION ET AL., Defendants.

(No. 7,531.)

(Submitted March 25, 1936.   Decided April 8, 1936.)

[56 Pac. (2d) 1072.]

150

*Mr. John W. Chapman,* for Plaintiff, submitted a brief and argued the cause orally.

*Mr. Raymond T. Nagle,* Attorney General, *Mr. Jeremiah J. Lynch,* First Assistant Attorney General, *Mr. John W. Bonner,* Special Assistant Attorney General, *Mr. Rockwood Brown* and *Messrs. Johnston, Coleman & Jameson,* for Defendants, submitted a brief; *Mr. H. J. Coleman* and *Mr. Bonner* argued the cause orally.

MR. JUSTICE MATTHEWS delivered the opinion of the court.

Original application for an injunction to restrain the State Highway Commission and its members from the expenditure of its funds for the erection of a building on the capitol grounds. To the complaint filed after leave of court granted, the defendants interposed a general demurrer, which admits the truth of all facts alleged.

The plaintiff is a taxpayer and a regular purchaser of gasoline, and prosecutes this proceeding on behalf of himself and all other persons similarly situated. As the interests of the public are involved in the controversy and the plaintiff is acting on behalf of the state, or, what is the same thing, the public interest, and as the wrong to be averted, if wrong there be in the erection of the building, is imminent, and substantial relief can be awarded herein, this court has original jurisdiction to issue the writ. (*State ex rel. City of Helena* v. *Helena Waterworks Co.*, 43 Mont. 169, 115 Pac. 200.)

The building which the commission proposes to build will cost $138,000, a part of which may be secured as a grant from the Federal Emergency Administration of Public Works, but, whether or not this grant will be secured, a substantial amount from the highway fund, built up from receipts from the gasoline tax imposed by the state, will be diverted to the payment of the cost of the erection of the building.

By resolution providing for the erection thereof, the commission declared that an emergency exists and that the building is immediately necessary to the proper functioning of the highway department and the performance of the duties imposed by law upon the commission. The plaintiff concedes that all that is said by the commission is true and sets up facts in corroboration thereof, thus presenting the sole question of the authority of the commission under the law to use a portion of the fund derived from the gasoline tax for the erection of the building.

A State Highway Commission was first created in this state by Chapter 170 of the Laws of 1917, which Act was repealed by Chapter 10 of the Laws of 1921, Extraordinary Session, a new enactment on the subject, carried into the Codes of 1921 as sections 1783 to 1802, inclusive. Section 1783 was amended by Chapter 129, Laws 1925, and section 1789 was repealed in part by Chapter 176, Laws 1931; but these changes are not important here. A gasoline license tax law was enacted in 1921 and appears as sections 2381 to 2396, inclusive, Revised Codes

1921, certain of these sections being amended from time to time. Sections 2382, 2383 and 2392, above, were amended by Initiative Measure 31, in the election of 1926, appearing at page 604 of the Laws of 1927. Initiative Measure 31 was repealed by Chapter 163, Laws 1935, on recommendation of the Code Commissioner, but by virtue of Chapters 18 and 19, Laws 1927, none of the force and effect of the measure has been lost. Within these various Acts as they remain upon the statute books appear the powers, duties and authority of the commission and the purposes for which the funds derived from our present 5 cent. per gallon gasoline tax may be expended.

Section 13 of Chapter 19, Laws 1927, declares: ''All money received by the State Treasurer in payment of license taxes under the provisions of this Act, shall be deposited by him in, and credited to, the State Highway Fund. All money so collected and deposited * * * shall be used and expended by the State Highway Commission in the construction, reconstruction, betterment, maintenance, administration and engineering on the Federal Highway system of highways in this state selected and designated under the provisions of the Federal Aid Act, approved July 11, 1916, and the Federal Highway Act approved November 9, 1921, and all amendments thereto, and for the purpose of construction, reconstruction, betterment, maintenance, administration and engineering of highways leading from each county seat in the State to said Federal Highway system of Federal Aid roads where such county seat is not on said system, and for the purpose of construction, reconstruction, betterment, maintenance, administration and engineering of such other roads as have been or may be authorized by the laws of Montana, for the collection and enforcement of this Act, and for the purpose of payment of refunds and drawbacks authorized by law to be made to purchasers of gasoline used in this state for other purposes than the propulsion of motor vehicles over the public highways and streets of this state; provided, that the total cost to the State for administration and engineering on the Federal Aid work contemplated by this Act shall not

exceed for any fiscal year eight per cent. (8%) of the total of State, Federal Aid and other available funds expended under the supervision of the State Highway Commission.''

Whether such action was necessary or not, the legislature has from time to time passed an appropriation bill appropriating the money in the highway fund, and such other amounts as may come into the fund, for use by the commission, the latest enactment of this nature being House Bill 292, p. 458, Laws 1935, appropriating for the period from July 1, 1935, to June 30, 1937, the sum of $6,500,000, together with all additional money deposited by law to the credit of the fund, for ''expenditure by the State Highway Commission as provided by law.''

This fund is, therefore, available to the commission for any purpose for which it may expend money, subject only to the provision that not to exceed 8 per cent. of the total funds available may be expended for ''administration and engineering'' purposes; and it is conceded that, if the building is erected from administration funds, this provision will not be violated. The percentage thus employed in 1928 was 6.77, but has steadily diminished until, in 1935, it was but 3.68, or less than half the amount permitted by law. If no additional amounts come into the fund, the 8 per cent. of the $3,250,000 appropriated for the current year will exceed $400,000, and the cost of the building, in addition to an expenditure equal to that of the fiscal year ending June 30, 1935, will not reach that amount.

Under our political system the entire source of governmental authority is found in the people themselves. Either directly or through their chosen representatives, they create such offices and agencies as they deem desirable for the administration of the public functions, and declare in what manner and by what persons they shall be exercised; prescribe the quantum of power to be attached to each department and the conditions upon which its continuation depends. Their will, in these respects, finds its expression in their Constitutions and laws. (Mechem's Public Offices and Officers, 329.) But the powers which an officer, commission or department may exercise are not

confined to those expressly granted by the Constitution or statutes of the state. "In addition to powers expressly conferred upon him by law, an officer has by implication such powers as are necessary for the due and efficient exercise of those expressly granted, or such as may be fairly implied therefrom. But no power will be implied other than those which are necessary for the effective exercise and discharge of the powers and duties expressly conferred." (46 C. J. 1032.)

With reference to municipal corporations, this court has rather narrowed this rule, by declaring that such agencies have only those implied powers which are "indispensable" in order to carry out those expressly granted, and that, where there is a fair and reasonable doubt as to the existence of a particular power, it must be resolved against the existence of the power. (*Helena Light & Ry. Co.* v. *City of Helena,* 47 Mont. 18, 130 Pac. 446; *City of Bozeman* v. *Merrell,* 81 Mont. 19, 261 Pac. 876.) However, with respect to these corporations, the legislature has, apparently, attempted to define in detail all powers to. be exercised in the eighty-odd subdivisions of section 5039 of the Revised Codes of 1921 and the amendments thereto (Laws 1925, Chap. 115; Laws 1927, Chap. 20), and in subsequent sections, while here no attempt to define the powers of the State Highway Commission was made; indeed, it would be altogether impractical to prescribe by statute the numerous and varying duties of such an agency of the state. (*State ex rel. Priest* v. *Regents,* 54 Wis. 159, 11 N. W. 472.) All of the commission's powers with respect to our highways must be implied from the sweeping authority vested in it to expend the funds placed at its disposal "in the construction, reconstruction, betterment, maintenance, administration and engineering on the Federal Highway system" and other roads mentioned. Within the Act there can be found no express power to purchase machinery, equipment, and appliances for the construction and maintenance of highways, nor even the purchase of material which goes into the roads, bridges, and viaducts; yet over the period of its ex-

istence, the commission has expended, without question, hundreds of thousands of dollars for these purposes.

With reference to boards charged with the construction of roads, but with no such broad authority or vast territory under their jurisdiction, it is held that the power and authority to lay out and construct roads carries with it the implied authority to purchase materials and appliances necessary in such construction; that the authority to "purchase" includes the authority to lease, and the right to purchase tools and the like includes the right to purchase necessary automobiles. (*State* v. *Younkin,* 108 Kan. 634, 196 Pac. 620; *Henry* v. *Rogers,* 19 Ala. App. 376, 97 So. 427; *Calloway* v. *Road Improvement Dist.,* 143 Ark. 338, 220 S. W. 450; *State* v. *Cox,* 154 Ark. 493, 243 S. W. 651; *McCord* v. *Little River County,* 155 Ark. 402, 244 S. W. 445.)

It is clear that the legislature intended that the commission purchase equipment, appliances and material in the "administration" of the department, but the law is ambiguous as to how far it may go in expending the percentage permitted to be used for administration and engineering. In such a case, resort may be had to the history of the legislation. (59 C. J. 1017; *State ex rel. Federal Land Bank* v. *Hays,* 86 Mont. 58, 282 Pac. 32.)

The sponsors of Initiative Measure 31 circulated an "affirmative argument" for the adoption of the Act, explaining the advantages to be secured, in question and answer form. In view of the fact that the bulk of the highway fund had theretofore been expended for "administration and engineering," the question was asked: "If this measure is enacted into law, will the money raised actually be spent on the roads?" And answered: "Yes, every dollar, 92 per cent. going directly into materials and labor, and 8 per cent. to engineering, supervision and general overhead." "Overhead" in this connection means the continuous expenses of a business (*Dairymen's League Co-op. Assn.* v. *Holmes,* 207 App. Div. 429, 202 N. Y. Supp. 663), the expenses and obligations incurred in connection with operation (*New York Canning Crops Co-op. Assn.* v. *Slocum,* 126 Misc.

30, 212 N. Y. Supp. 534), expenses necessarily incurred in organization, office expenses, engineering, inspection, supervision and management during construction (*Bonbright* v. *Geary,* (D. C.) 210 Fed. 44); "denoting such general expenditure in a financial or industrial enterprise as cannot be attributed to any one department or produce, excluding cost of materials, labor and selling; fixed charges." (Standard Dictionary; *Charles Behelen Sons' Co.* v. *Ricketts,* 30 Ohio App. 167, 164 N. E. 436, 439.) We must, therefore, determine whether or not the construction of buildings for the housing of machinery, equipment, engineering and administration employees; for drafting, testing of materials and directing construction, is necessary in the administration of the highway department as a part of its legitimate "overhead," and, if so, whether or not the legislature intended that such necessary buildings be constructed from the 8 per cent. of the highway funds permitted to be used for "administration and engineering" purposes.

While the law declares that the "office" of the commission shall be maintained at the State Capitol Building (Rev. Codes 1921, sec. 1783, as amended by Chapter 129, Laws 1925), it is not conceivable that the legislature intended that the administration and supervision of the "construction, reconstruction, betterment and maintenance" of upwards of 5,000 miles of state and federal main highways, and their connections forming a network, over the vast area of the state, should be conducted exclusively from that office.

Over the period of years from 1920 to 1935, the complaint discloses, the commission has erected buildings for storage, shops and offices in twelve cities throughout the state, and its reports to the legislature made pursuant to law contain this information. No one disputes the necessity for the erection of these buildings, and the legislature has at no time intimated that it intended that such necessary buildings should be furnished to the commission in some manner other than by the expenditure of administration funds. If the broad scope of the authority

vested in the commission contemplated the construction of the buildings mentioned by the use of a part of the 8 per cent. allotted to administration in the years in which the buildings were constructed, it will permit, in like circumstances, the construction of the proposed building.

While administrative practice does not avail to overcome a statute so plain in its commands as to leave nothing for construction, such practice, if consistent and unchallenged, will be overturned only for very cogent reasons, if the scope of the command is indefinite and doubtful, particularly when the practice has received congressional or legislative approval. (*Alaska S. S. Co.* v. *United States,* 290 U. S. 256, 54 Sup. Ct. 159, 78 L. Ed. 302; *Norwegian Nit. Pro. Co.* v. *United States,* 288 U. S. 294, 53 Sup. Ct. 350, 77 L. Ed. 796; *State ex rel. Public Service Commission* v. *Brannon,* 86 Mont. 200, 283 Pac. 202, 67 A. L. R. 1020; *Miller Insurance Agency* v. *Porter,* 93 Mont. 567, 20 Pac. (2d) 643.)

As to the necessity for the construction of the proposed building, it is shown in the complaint and the resolution of the commission made a part thereof, that the duties, activities and responsibilities, and the departments thereof created to take care of them, have greatly increased and will further increase in the near future by reason of additional duties imposed by the federal government; that while the law merely provides for the "office" of the commission in the capitol building, the commission has availed itself of all possible space within the building and has rented available space in the business district of Helena, a mile or more from the capitol, on which it pays rent and is still unable to secure sufficient necessary housing facilities to carry on its work. The court may well take judicial notice of the manner in which the departments of the highway commission have inundated the capitol building; the "plans department," for instance, with its forty to fifty employees, its drafting tables and filing cases, fills the senate chamber and its corridors to overflowing; the "right of way" and other departments occupy the Lieutenant Governor's quarters and legis-

lative committee rooms. The necessity for an adequate "testing laboratory" is immediate and imperative; additional space for plans, administration, construction and engineering departments, highway traffic survey, and other activities must be shortly provided, and can be secured in no manner but by the erection of the proposed building.

The commission declares that "to insure a wise and economical use of the funds of the commission, the personnel and employees of the various departments of the commission should be united in one building," and that the saving of rent now paid would, "in a comparatively short time," pay for the cost of the proposed building.

If the building can be erected in the manner proposed, it will cast no additional burden upon the taxpayers; whereas, if it must be built as a unit of the state capitol, other means of financing must be found. As the money is already available in a special fund, no appropriation bill is necessary; "the act may be accomplished in any manner receiving the sanction of the law." (*State ex rel. Toomey* v. *State Board of Examiners,* 74 Mont. 1, 238 Pac. 316, 320; *State ex rel. Veeder* v. *State Board of Education,* 97 Mont. 121, 33 Pac. (2d) 516.)

Here the commission is granted no express power to rent, lease, purchase or construct buildings, but merely the broad general power to expend the moneys coming into the special fund, for the "construction, reconstruction, betterment, maintenance, administration and engineering" of our vast system of highways and roads, qualified only by the provision that not to exceed 8 per cent. of the total funds provided shall be spent for "administration and engineering" purposes. Where the legislature sees fit to confer upon a board or commission such broad general powers, the repository of the power is vested with discretion in choosing the means and methods of accomplishing the result expected, and, in the absence of fraud or manifest abuse of that discretion, its determination is conclusive. (*State ex rel. Pew* v. *Porter,* 57 Mont. 535, 189 Pac. 618; *State ex rel. Pigott* v. *Porter,* 57 Mont. 539, 189 Pac. 619.)

The authority vested in the commission to expend millions of dollars per year for the construction, reconstruction, betterment and maintenance of thousands of miles of highways and roads, imposes upon the commission the duty to expend these vast sums effectively through the use of the 8 per cent. permitted to be used for administrative and engineering purposes. Such broad granted authority confers upon a commission, by implication, all necessary authority and power to render the granted powers fully efficacious and the performance of such duties effectual. (*State* v. *Hackmann*, 276 Mo. 110, 207 S. W. 64; *Union Indemnity Co.* v. *State*, 217 Ala. 35, 114 So. 415, 416; *Huffman* v. *State Roads Commission*, 152 Md. 566, 137 Atl. 358.) In the Alabama case it is well said that "the inclusive terms of our statutes conferring powers on the state highway department, a state agency engaged in a large business enterprise of public character, carry the implied power to do all things incidental and appropriate to the accomplishment of the work in hand in a businesslike and orderly manner."

On the showing made it is apparent that the State Highway Commission cannot function effectively without additional housing facilities and that the condition is becoming more acute as time passes; that in the emergency it declares exists, it is imperative that the proposed building be erected as soon as possible; and that the erection of the building is, under the sweeping authority vested in the commission, a proper function in the administration of the highway program, so long as the necessary building can be erected without transgressing the injunction of the legislature not to spend in excess of 8 per cent. of the available funds for administration and engineering purposes. The complaint is insufficient to state a cause of action.

Defendant's demurrer is sustained and the proceeding dismissed.

ASSOCIATE JUSTICES STEWART, ANDERSON and MORRIS concur.

MR. CHIEF JUSTICE SANDS, Dissenting: This is an original application to put the court's stamp of approval upon a purpose

of the State Highway Commission to build a building to house the administrative forces of the highway board on the state capitol grounds.

The state Constitution, section 10, Article XII, reads: "All taxes levied for state purposes shall be paid into the state treasury, and no money shall be drawn from the treasury but in pursuance of specific appropriations made by law." It has been the practice of the legislature at each session past to appropriate the funds coming into the state from the license tax on gasoline in its entirety to the purpose of building highways to insure obedience of this constitutional provision. The authority of the highway board is specifically stated as "all money so collected and deposited    *    *    *    shall be used and expended by the State Highway Commission in the *construction, reconstruction, betterment, maintenance, administration and engineering on the Federal Highway system* of highways in the state." (Laws 1927, Chap. 19, sec. 13.)

Section 2, Article XIII, of the Montana Constitution provides: "The legislative assembly shall not in any manner create any debt except by law which shall be irrepealable until the indebtedness therein provided for shall have been fully paid or discharged; such law shall specify the purpose to which the funds so raised shall be applied and provide for the levy of a tax sufficient to pay the interest on, and extinguish the principal of such debt within the time limited by such law for the payment thereof; but no debt or liability shall be created which shall singly, or in the aggregate with any existing debt or liability, exceed the sum of *one hundred thousand dollars ($100,000)* except in case of war, to repel invasion or suppress insurrection, unless the law authorizing the same shall have been submitted to the people at a general election and shall have received a majority of the votes cast for and against it at such election." Briefly stated, the section requires a vote of approval of the people of an expenditure of $100,000, or more, for a single purpose. This question is exhaustively treated in the case of *State ex rel. Diederichs* v. *State Highway Commission,*

89 Mont. 205, 296 Pac. 1033, and there is no necessity for repetition here. The unconstitutionality of an effort to do substantially, as here—appropriate over $100,000 to a single purpose—was there declared.

In a nutshell, the question for decision is: Does the State Highway Commission have the implied authority to build a $138,000 building on the state capitol grounds and pay for it out of the gasoline license tax funds? To point out the many instances in which the implied powers of officers and boards have been adjudicated would afford some authority for settling the question, but after reading all of them the mind of the reader would be so confused that the labor would be almost useless. This question of implied power under the authority given can be determined as correctly, perhaps, by any well-informed citizen as by any member of this court. I propounded the question to one of the members of the past legislatures perhaps longest in that body of any man in the state. He very promptly informed me, without suggestion on my part, that it was his understanding of the authority given the board that expenditures of this character were not authorized by the Highway Act.

There is no question but that the State Highway Commission does need more room for its greatly expanded activities. This necessity is urged upon this court as a reason for a prompt decision in order to permit the immediate construction of the building. This necessity has not arisen all at once, but should have been foreseen months ago and the matter given a wider publicity in order to acquaint the public with the question of expending $138,000 of the highway funds for office building purposes. It is urged that the highway commission has purchased machinery and erected small buildings in various towns of the state as a part of their implied powers and duties. No one has protested and probably no one disputes their authority so to do. The question before us goes much further. The pending proposition is fraught with questions of future policy that should be carefully considered before establishing a precedent.

Shall boards of the state come onto the state capitol grounds and erect buildings over which the board will have exclusive authority, paid for from the funds placed in their hands, for the various purposes of the state? If this board can erect a building, may not some other board, such as the educational board, for instance, erect a building for its exclusive use? Will future boards have similar authority? If the board can build a building upon capitol grounds, what authority would it have to build the same building upon other grounds? Would it have the authority, for instance, to purchase the abandoned buildings of the Intermountain College situate a half mile from the capitol grounds, or would it have authority to build the same building in some other city of the state?

After considering these elements of the problem, we may as well go further and determine whether it is wise to erect an expensive building in Helena at this particular time when the earth appears not to have determined whether it can stay just where it belongs. We still have earth tremors, which is proof positive that this particular section in and about Helena is not yet stationary. These are questions which may be considered as questions of policy, and this court is not ordinarily concerned with questions of policy. Policy questions are up to the board or the legislature, as the case may be. I think, however, it is within our province in this particular instance, where the public has had no opportunity to know what is contemplated or express itself, to consider these questions in passing upon the case of implied authority now before us. In a recent case the State Board of Education presented to this court the question of its authority to erect a building at Missoula for a school of journalism to cost $180,000. It recited that the national government was to furnish $81,000 and the board was to expend only the sum of $99,000 from state funds. The board undoubtedly kept the state's cost to the limit of $99,000 in order to avoid the necessity of putting it up to a vote of the people. They recognized the Constitution, section 2 of Article XIII, supra, as requiring a vote of the people where the expenditure amounts to

$100,000 or more. It seems to me that such provision limits the authority for any single investment for the state at $100,000, and any attempt to hurriedly authorize an expenditure of a greater amount by any board should be very critically examined, before this court lends its approval to such expenditure. If we do not recognize that constitutional limit, there is no other stopping place for state expenditures beyond the $100,000.

The highway commission is a state board administering a state function of the entire state. Notwithstanding the present highway board is the best financed of any board in the state, flush financial condition therein should not control a policy of present and future state expenditures. The funds of the highway board amount to approximately $4,000,000 a year derived from the 5-cent gasoline charge levied upon every purchaser of gasoline in the state, except such gasoline as is used for purely stationary machinery. The price of gasoline, with the tax added, is as high as or the highest in the United States, as statistics show. It has served to build a magnificent system of highways in the state. The people who buy gasoline are in general the common citizens of the state. Automobiles have ceased to be a luxury and are now properly classified as a necessity. This $4,000,000 tax per year comes almost exclusively from the common citizens of Montana. The extra high price of gasoline in Montana encourages all tourists coming into Montana, before they enter the state, to fill up their tanks and travel much of their way over our highways tax-free. They plan, as far as possible, to leave the state with empty tanks. People living on the borders of the state very generally go outside the state to buy their gasoline if they can conveniently do so, and thereby usually save about 4 cents per gallon, 2 cents as the difference in state gasoline tax and the other 2 cents the discrimination of the big oil companies against Montana in spite of the law passed by the last legislature to prevent such discriminations. The state loses much money each year from the gasoline fund by these discriminations. We have so much gasoline in our state that gasoline should be as cheap here as elsewhere, but unfor-

tunately it is not. I hope the time may soon come when the price shall be reduced to correspond with that in other states. The expenditure from that fund of $138,000 for an administration building on the capitol grounds would make that hoped-for condition just so much farther away.

There should be no implied authority to expend money for administration buildings within the boundaries of the capitol grounds except for the administration of state purposes. Such administration should be housed and its local administration paid by the state. If the state is not to house the activities of the board and pay its headquarter administrative costs, then the building should not be placed on the capitol grounds. It may be located anywhere in the state as the board may see fit.

This principle of the payment of these headquarters expenses is elsewhere important. The Fish and Game Commission and the Hail Insurance Administration also now pay office rent for rooms in the capitol. All administrative expenses of the Hail Insurance Board, including rent, are paid out of hail insurance funds; that is, it is all paid by the farmers that insure against hail with that board. If the hail insurance is taken out with the big foreign insurance companies upstairs, the state pays the rent out of its general funds of the state, a fund collected from the farmers in large part, as general taxpayers, so that the farmer pays his share twice. More than that, the farmer pays on his property, while the insurance companies have no property in the state and pay only a paltry 2 per cent. on their income from their business—a plan of doing business that enables these foreign companies, without property in the state, to take from the state each year a net profit of about $3,000,000. The offices for the administration of the big insurance companies, with an income of $10,000,000 administered by the state auditor at a very considerable expense paid from the general funds of the state, now pay nothing for the administration of the road fund with an income of about $4,000,000. The opinion of the majority presumes to approve and continue that procedure.

The discrimination in this case against gasoline consumers of the state and, by analogy, other like discriminations thereby approved by the majority opinion, compels my dissent thereto.