STATE ex rel. STATE HIGHWAY COMMISSION et al., RELATORS, *v.* DISTRICT COURT et al., RESPONDENTS.

(No. 7,697.)

(Submitted May 22, 1937.  Decided June 12, 1937.)

[69 Pac. (2d) 112.]

*Mr. Warren Toole* and *Mr. George E. Hurd,* for Relators, submitted an original and a reply brief, and argued the cause orally.

*Mr. Wellington D. Rankin* and *Mr. Arthur P. Acher,* for Respondents, submitted a brief; *Mr. Rankin* argued the cause orally.

MR. JUSTICE MORRIS delivered the opinion of the court.

April 21, 1937, the State Highway Commission of the State of Montana called for the submission of bids to construct Federal Aid Project Number 267–A, consisting of approximately eight miles of the trunk highway known as Route No. 24 running from the city of Glendive to Bonner, near the city of Missoula. The eight miles of such highway that give rise to this controversy are a part of Route 24 between the town of

Augusta and the village of Lincoln, in Lewis and Clark county. May 5, 1937, the Chamber of Commerce of Helena, Montana, and Shirley C. Ashby, a taxpayer of Lewis and Clark county, filed a petition in the district court of that county, alleging failure of the State Highway Commission to comply with certain provisions of the statutes in laying out and establishing such highway, and asked for a restraining order and an order to show cause why an injunction should not issue enjoining the commission from awarding any contract for the construction of such project. A temporary restraining order was issued May 5, 1937, directing the State Highway Commission and the members thereof to appear on May 8 and show cause why they should not be enjoined from letting the contract. May 7 the relators here filed an application praying for a writ commanding Hon. George W. Padbury, Jr., Judge of the District Court of Lewis and Clark County, to vacate, annul, and set aside the restraining order, the order to show cause and dismiss the above mentioned petition. Pursuant thereto oral arguments were heard by this court May 22, briefs were filed, and the matter has been duly considered.

Counsel for the respective litigants have raised a number of questions for determination and have argued such questions at length, citing numerous authorities; but after a careful review of the applicable legislative Acts and the amendments thereto, we are of the opinion that court decisions have but little bearing on the questions pertinent to a determination of the controversy, except certain decisions of this court which will be adverted to later, and in which some of the statutory provisions of our highway laws have been interpreted and applied to some extent. It appears to us that there are not any very reasonable grounds for any material difference of opinion as to the construction that must be placed upon the particular provisions of our statutes the meaning of which is brought in question here.

The question of general highway improvement throughout the country had been agitated in the Congress of the United States for a number of years prior to 1913, in which year our Legislative Assembly enacted Chapter 78, Thirteenth Session

Laws, as the initial Highway Act. No means of raising revenue for road building was provided by that Act, but a scheme of road building was modestly provided for, obviously in anticipation of the agitation of the subject of highway building in Congress resulting in some feasible and substantial plans for road construction. The 1913 Act was repealed and superseded by Chapter 170 of the Fifteenth Session, 1917, which divided the counties of the state into twelve districts, with a highway commission of twelve persons, one from each district, appointed by the Governor, and the commission was vested with power to make all rules and regulations necessary for its guidance and for the guidance of an executive committee of three, to be appointed from its own membership, and "in its discretion to make all rules necessary to comply with the provisions of the Federal Aid Road Act of Congress, approved July 11, 1916 (39 Stat. at Large, 355), and to obtain for the state of Montana the full benefit of the said Act of Congress." (Section 5(a).) No provision was made by that Act for any participation by the counties.

Section 5(b) of that Act provided: "The State Highway Commission is hereby authorized to designate what public roads in the State shall be classed as State Highways and subject to improvements under the provisions of this Act and under the provisions of the said Federal Aid Road Act of Congress; and the State Highway Commission shall also formulate necessary rules and regulations for the construction, repair and maintenance of State Highways and may provide for local supervision in such cases." By section 8 the commission was authorized on behalf of the state to assent to the provisions of the Act of Congress above referred to, and further authorized to enter into all contracts with the United States Government relating to the survey, construction, and maintenance of the roads under the provisions of the Act of Congress as may be required, "and, do all other things necessary to fully carry out the co-operation, contemplated and provided for by the said Act or Acts." The good faith of the state was pledged to furnish funds equal to the amount furnished by the federal government for the con-

struction and maintenance of rural post roads; 75 per cent. of all moneys collected for motor license fees was directed to be credited to the state highway fund, and 25 per cent. to be credited to the various counties to be placed in the general road fund.

The 1917 Act was repealed and superseded by Chapter 10 of the Extraordinary Session of 1921, which is the present law except for subsequent amendments not relating to any provisions involved in this controversy.

Running through the original Act of 1913, and all subsequent Acts and amendments to the highway laws, we see a clear legislative intent to create a State Highway Department as an arm of the state government, vested with broad powers in order that such department might bring to realization the state's vision of a system of highways such as we enjoy today. The only part the counties have had, or were intended to have, in this work of progress was by giving cooperative aid to the commission, and their participation was merely incidental. Counties are vested with no affirmative or constructive power by any of the old Acts nor by the present law. We are clearly of opinion that the legislature did not intend to create the highway commission as a state agency to carry out the state's highway construction plans and at the same time vest in any county, another state agency, the power to control and, in effect, veto constructive acts of the commission done in compliance with the mandate of the legislature. And we think that to the extent that this court has heretofore construed our state highway statutes its decisions confirm our conclusions here.

In *State ex rel. McMaster* v. *District Court*, 80 Mont. 228, 260 Pac. 134, it was held, in substance, that the highway commission was vested with exclusive power to secure a right of way for state highways by the exercise of the right of eminent domain, and that the county could not exercise such power except to secure a right of way for a county road.

In *State* v. *Hoblitt*, 87 Mont. 403, 288 Pac. 181, 183, it was said: "The highway commission is empowered, 'in conjunction with the board of county commissioners of the several counties

of the state,' to designate what public roads shall be state highways; the establishment and construction of such highways, under federal aid projects, is under the control of the state highway commission, and it is authorized to make changes in state highways (secs. 1788 to 1796, Rev. Codes 1921), but nowhere in the Act granting powers to the commission (Chap. 139, Part 3, Political Code 1921, secs. 1783, 1802) is the commission empowered to discontinue or abandon a county road superseded by a state highway. The power to lay out and establish, construct, or maintain highways does not confer power to vacate them. [Citing cases from other jurisdictions.] The power to discontinue a public highway is vested in the board of county commissioners of the county on petition of freeholders of the road district. (Sec. 1635, Rev. Codes 1921.) The construction of the new highway is therefore entirely separate and distinct from the matter of the discontinuance of the present road, and the two Acts are under divergent authority. The present action has only to do with the establishment of the state highway.'' In that action a county road had been designated as a state highway and the highway commission thereafter sought to change the route approximately a quarter of a mile away from the former line established along the old county road to a new route. The court held the commission might establish the new route but could not abandon the old road as a county highway for the reasons stated. (In passing we think it well to state that that part of the foregoing opinion wherein it is stated that the power to lay out and construct highways does not confer the power to abandon, and that part relative to the power to discontinue public highways, obviously refer to county highways and not to state highways, as the power to ''lay out, alter,'' etc., granted by section 1797 carries the implied power to abandon or change a state highway; and we further think that where the highway commission is empowered to do all things necessary to obtain the federal aid to build roads, the commission would have the power to comply with such changes in any established route as might be advised by federal authorities.)

In *Guillot* v. *State Highway Com.*, 102 Mont. 149, 56 Pac. (2d) 1072, 1076, when we had under consideration the power of the commission to use certain funds to erect a highway building, we said: ''The authority vested in the commission to expend millions of dollars per year for the construction, reconstruction, betterment, and maintenance of thousands of miles of highways and roads, imposes upon the commission the duty to expend these vast sums effectively through the use of the 8 per cent. permitted to be used for administrative and engineering purposes. Such broad granted authority confers upon a commission, by implication, all necessary authority and power to render the granted powers fully efficacious and the performance of such duties effectual.'' (Citing cases.) Quoting from an Alabama case (*Union Indemnity Co.* v. *State*, 217 Ala. 35, 114 So. 415), we further said: ''The inclusive terms of our statutes conferring powers on the state highway department, a state agency engaged in a large business enterprise of public character, carry the implied power to do all things incidental and appropriate to the accomplishment of the work in hand in a businesslike and orderly manner.''

With this background of legislative policy and purpose, supported in some particulars by decisions of this court, we come to the consideration of the contentions of the petitioners in the district court proceeding. Their contentions are best presented in their own words: ''It is the position of the 'plaintiffs' in the action heretofore instituted in the district court that the Montana State Highway Commission is without authority to expend money for the construction of the road in question for the reason that the same was not laid out as a state highway or designated as a state highway by the board of county commissioners of the county of Lewis and Clark, Montana, and that no official road map of the State of Montana has been filed with the county clerk and recorder of Lewis and Clark county, Montana, showing the location of said section of highway as a part of a state highway. This contention is based upon the provisions of sections 1788 and 1796, Revised Codes of Montana, 1935. The pertinent portion of section 1788 here to be considered is

the last sentence, as follows: 'The state highway commission is hereby authorized to, and shall, in conjunction with the board of county commissioners of the several counties in the state, designate such public roads in the state as shall be classed as state highways and subject to improvements under the provisions of said Federal Aid Road Act of Congress, and the state highway commission in conjunction with the board of county commissioners shall also formulate necessary rules and regulations for the construction, repair, maintenance and marking of state highways and bridges, and may provide for local supervision in such cases.'

"Section 1796 provides as follows: 'Upon the selection and approval by the commission of the system of state highways, the commission shall cause to be prepared an official road map of the State of Montana showing outlined thereon the exact location of said state highways prior to October 1, 1921, if possible; a copy of such map shall be filed with each county clerk and after such election and filing no changes except the necessary relocations and alterations in portions of the state highway system for the purposes of construction shall be made by said commission until further investigation or hearings are held in the county or counties in which such change or changes are proposed. If, after investigation or hearing, any alteration or additions shall be deemed expedient by the commission, the change shall be entered in writing upon the records and maps of the commission and each county clerk shall be immediately notified to alter the official map on file with him in accordance therewith.'

"From a reading of these two sections it will be observed that the State Highway Commission is only authorized to designate state highways 'in conjunction with the board of county commissioners of the several counties in the state.' That the counties are to be consulted in the matter is borne out by section 1796, from which it will be observed that the Highway Commission was, before October 1st, 1931, to prepare an official road map and no changes were to be made until hearings had been held in the county in which the changes are proposed."

It will be noted that the part of section 1788 relied upon in the foregoing contentions is, "The state highway commission is hereby authorized to, and shall, in conjunction with the board of county commissioners of the several counties in the state, designate such public roads in the state as shall be classed as state highways and subject to improvements under the provisions of said Federal Aid Road Act of Congress." The section says nothing about co-operating with the county boards in laying out or building new state highways, but co-operation for the improvement of public roads. "Public highways" are defined by section 1612, Revised Codes, as follows: "All highways, roads, lanes, streets, alleys, courts, places, and bridges laid out or erected by the public, or now traveled or used by the public, or if laid out or erected by others, dedicated or abandoned to the public, or made such by the partition of real property, are public highways." The reference in the statute to "public roads," obviously means roads then built and in use in the several counties.

Section 1788 is in two sentences. The second is the one quoted heretofore from the brief of the petitioners in the district court proceeding; the first sentence reads: "The state highway commissioner shall have power, and it shall be his duty, to formulate all rules and regulations necessary for the government of the state highway commission and it is hereby authorized to make all rules necessary to comply with the provisions of the Federal Aid Road Act of Congress, approved July 11, 1916, and all other Acts granting aid for public highways, and to obtain for the state of Montana the full benefit of such Act." The commissioner referred to in this part of section 1788 was, under the old provisions of the law, the chairman of the commission; was vested with practically the same powers as are now exercised by the commission in arranging to comply with and obtain the federal aid provided by the Act of Congress of July 11, 1916. (Compare *State ex rel. Matson* v. *O'Hern*, 104 Mont. 126, 65 Pac. (2d) 619.) It is not suggested in the statutes that counties shall have anything to do with obtaining federal aid

nor any control over highways approved by and made a part of our highway system constructed with such aid.

Section 1791 provides: "For and on behalf of the state of Montana, and in conformity with the requirement of section 1 of said Act, the provisions of that certain Act of Congress approved July 11, 1916, known as the Federal Aid Road Act and entitled 'An act to provide that the United States shall aid the states in the construction of rural post roads, and for other purposes,' is hereby assented to. The state highway commission is hereby authorized to, for and on behalf of the state of Montana, enter into all contracts and agreements with the United States government or any officer, department or bureau thereof, relative to the construction or maintenance of highways in the state of Montana; and the state highway commission for and on behalf of the state of Montana is hereby authorized to do all other things necessary or required to carry out fully the co-operation contemplated by the said Act of Congress as hereby assented to, relative to the construction and maintenance of roads and highways in the state of Montana." Again there is no reference to counties.

Then we have section 1797, the first paragraph of which provides as follows: "The state highway commission shall have the power and authority to acquire by purchase or otherwise, necessary rights of way for state highways and to lay out, alter, construct, improve and maintain highways in the state of Montana, and to acquire by purchase or otherwise, deposits of road-building materials, and the state highway commission shall have the authority to exercise the power of eminent domain in the name of the state for any of the above mentioned purposes." And we find throughout all Acts and amendments thereto, relative to the highway laws, a clearly obvious legislative intent to vest in the highway commission power to act for the state in all matters, and in the light of these provisions we are unable to find anything that shows any intent to vest in the counties any veto power to hamper or destroy the exercise of the powers vested in the commission to establish, construct, and maintain state highways.

54

The State Highway Commission is the creature of the legislature and has no powers except those granted to it by the legislature. The same is true as to powers vested and exercised by the several counties, and it would be an unreasonable construction of the statute to assume that the legislature intended to set up a commission such as the highway commission and vest in it rather extraordinary powers, and then vest in another subdivision of the state government any power that might be exercised to defeat the effective exercise of the powers vested in the commission, and such would be the result if the contentions above advanced in the action at bar were upheld.

The most that can be said in support of the construction placed upon section 1788 by the petitioners in the district court is that the counties are given a power of obstruction; that they can prevent a particular county road being taken over by the state and converted into a state highway. Such a power is inconsistent with and has no place in a policy of construction such as is provided for by our highway Acts. We will not assume that the legislature intended to provide by law a way to defeat the plans and purposes of the state and federal governments, when, by concerted action, they lay out a particular route as a part of a great highway system. On the contrary, we must assume that the legislature intended to enact a workable law.

There are other reasons why we must hold the contentions above made untenable: Counties are not the owners of the public roads established within their boundaries; they belong to the state. (*State ex rel. Judith Basin County* v. *Poland,* 61 Mont. 600, 203 Pac. 352, 354; *State ex rel. Foster* v. *Ritch,* 49 Mont. 155, 140 Pac. 731; *State ex rel. Furnish* v. *Mullendore,* 53 Mont. 109, 161 Pac. 949; *State ex rel. Donlan* v. *Board of County Commrs.,* 49 Mont. 517, 143 Pac. 984.) In the control and supervision of county roads "the county acts in its governmental capacity as a trustee for the public and the agency through which the state acquires the property." (*State ex rel. Judith Basin County* v. *Poland,* supra.) It might be contended with some reason that section 1795, wherein provision is made for conveying the right of way over an established county road

to the state when the state designates a particular county road as a state highway, recognizes title in the county. We think that provision is made for the purpose of having the county relinquish its control over the road selected to the state, and to fix, as a matter of record, responsibility for its supervision and maintenance.

A county is a subdivision of the state—a state agency. It is elementary that the principal, which is the state here acting through the legislature, has absolute control over the agent— the county—in any such matter as is involved in this controversy, and it would be an anomaly in law if the agent could arbitrarily nullify the act of the principal in any conflict between the two. We think the express provisions of our highway statutes above recited, and others of like tenor, must necessarily be construed as nullifying any such power in the counties as is contended for here, and if it can be said that any such power was ever vested in the counties by any provisions of the statutes, we hold that such provisions have been repealed by implication. To hold otherwise would necessarily deny to the commission a vital power essential in giving effect to the expressed purposes of the legislature in creating the commission and clothing it with authority to do the things it is necessarily directed to do and "to do all other things necessary or required to carry out fully the co-operation contemplated by the said Act of Congress as hereby assented to, relative to the construction and maintenance of roads and highways in the state of Montana." (Sec. 1791.)

By a brief review of the pertinent Acts of Congress we are confirmed in the above conclusion. Early in the World War period the country became convinced of our inadequate means of defense in the event we were drawn into the world conflict. Facilities for nation-wide transportation other than by railways were in a more or less primitive state, and it is quite obvious that the two Acts of Congress to which we will now briefly refer were enacted with the purpose in view of facilitating transportation between different parts of the country as measures in the interest of national defense.

The Act of Congress of July 11, 1916, expressly referred to by our section 1788, was "An Act To provide that the United States shall aid the States in the construction of rural post roads, and for other purposes." (39 Stat. 355). At the same session of Congress Chapter 418, "An Act Making appropriations for the support of the Army for the fiscal year ending June thirtieth, nineteen hundred and seventeen, and for other purposes," was enacted (39 Stat. 619, 650), providing for a Council of National Defense, and, among other things, the council was authorized and directed to investigate and recommend to the President "the location of extensive highways and branch lines of railroads." By Chapter 119, approved November 9, 1921, (42 Stat. 212, 23 U. S. C. A., secs. 1–25, and notes), the Act of July 11, 1916, was amended and in the title of the amended Act it is provided "that this Act may be cited as the Federal Highway Act," and by the new Act the duties placed upon the Council of National Defense were transferred to the Secretary of Agriculture and the Secretary of War was directed to turn over to the Secretary of Agriculture all war materials, equipment, and supplies of a certain class not needed by the War Department but suitable for highway improvement, to be distributed among the highway departments of the several states to be used in highways construction and maintenance. Section 6 of the Act (23 U. S. C. A., sec. 6) provides that "in approving projects to receive Federal aid under the provisions of this Act [chapter] the Secretary of Agriculture shall give preference to such projects as will expedite the completion of an adequate and connected system of highways, interstate in character." Section 7 (23 U. S. C. A., sec. 7) provides that "before any project shall be approved by the Secretary of Agriculture for any State such State shall make provisions for State funds required each year of such States by this Act [chapter] for construction, reconstruction, and maintenance of all Federal-aid highways within the State, which funds shall be under the direct control of the State Highway Department." The Act contains many other provisions of like import, and our legislature expressly

assented to the conditions on which the federal aid was extended to the state. In addition to the express legislative assent, we have repeatedly confirmed our assent to the provisions of the federal Acts mentioned by acceptance of vast amounts of federal funds expended in highway construction in the state, and by our co-operation with the Secretary of Agriculture in carrying out the plans and purposes of Congress. Until the Federal Highway Act was enacted in 1921, the state's means of raising revenue for state highway construction was limited, and up to that time the main reliance of the state in raising funds to match the funds provided by the federal government was upon the several counties, and the counties supplied such funds by the issuance and sale of highway bonds. The state later took over the burden that had been borne by the counties in producing revenue for the highway fund by diverting a portion of motor vehicle license taxes to that fund and later by a heavy tax upon gasoline, and now for more than a decade the cost of highway construction and maintenance has been met by state and federal funds, and the counties are the beneficiaries of our highway system without bearing any part of the cost of construction or maintenance.

At the 1927 session of our legislature, Chapter 18 was enacted, which now appears in the 1935 Revised Codes as sections 2396.1, 2396.2, and 2396.3, which provide: "All moneys of the state highway fund * * * shall be used and expended by the state highway commission in the construction, reconstruction, betterment, maintenance, administration and engineering on the federal highway system of highways in this state selected and designated under the provisions of the Federal Aid Act, approved July 11, 1916, and the Federal Highway Act approved November 9, 1921, and all amendments thereto, and for the purpose of construction, reconstruction, * * * of highways leading from each county seat in the state to said federal highway system." Certain provisions are then inserted directing how the funds shall be expended, and continuing: "Provided that nothing in this Act shall be construed to conflict with said

federal aid highway acts and the rules by which they are administered.'' (Sec. 2396.2.)

We are entirely satisfied that the legislature did not intend to enact any law that would prevent the state from joining with the federal government in furthering the highly commendable plans and purposes expressed in the Acts of Congress cited above.

On the failure of the commission to file the map referred to in ▮▮▮ section 1796, the only purpose that provision could have is to have the county records show what established roads, or highways in a particular county are under the exclusive control and supervision of the commission. We do not find in this section any mandatory provisions directing the commission to file the map before a contract is let. To say that the map must be filed in the county in which a state highway is to be constructed before a contract is let might lead to great embarrassment in the construction of state highways. To illustrate: If a road had been laid out and contracts let for construction, and in the course of construction it were found that some material changes were necessary in the route as shown by the map filed, it could not be the intention of the law to prevent the commission by mutual arrangements with the contractor to make such changes in the original plans as might be found necessary or advisable after construction was begun. We do not believe that there was any intention upon the part of the legislature to make the filing of the map of such exacting importance that it is compulsory that it be filed at any particular time, or that, after being filed, it might not be changed under such circumstances as are referred to above. We are of the opinion that the failure to file the map before the letting of the contract is not an act that would vitiate a construction contract, is not a failure to comply with the statute that brings injury to anyone, not such a delay as the petitioners in the district court proceedings may show here as substantial grounds for obtaining a writ of injunction.

It follows that our conclusion must be that the contentions of the respondents are without merit. The district court is di-

rected to annul and set aside the restraining order, the order to show cause, and dismiss the action.

MR. CHIEF JUSTICE SANDS and ASSOCIATE JUSTICES STEWART, ANDERSON and ANGSTMAN concur.