STATE ex Rel. MATSON, Attorney General, Relator, *v.* O'HERN et al., Respondents.

(No. 7,667.)

(Submitted February 3, 1937. Decided February 17, 1937.)

[65 Pac. (2d) 619.]

Mr. *E. K. Matson,* Attorney General, for Relator.

Mr. *John L. Slattery,* for Respondents D. L. O'Hern, Fred A. Fligman and Thomas O. Collins, submitted a brief and argued the cause orally.

Mr. *Horace S. Davis,* Mr. *Rockwood Brown* and Mr. *George E. Hurd,* for Respondents Harry J. McGregor, Rock-

wood Brown and L. J. Croonenberghs, submitted a brief; *Mr. Davis* and *Mr. Hurd* argued the cause orally.

MR. JUSTICE STEWART delivered the opinion of the court.

This is a *quo warranto* proceeding brought by the Attorney General against two sets of claimants to the offices of highway commissioners in the state of Montana. Some of the matters involved were before this court on a previous occasion. (*State ex rel. Holt* v. *District Court,* 103 Mont. 438, 63 Pac. (2d) 1026.) The opinions promulgated at that time contain a statement of the case and detail certain of the facts involved. Reference may be had thereto to supplement the statement now made.

The complaint filed by the Attorney General sets forth that the action was brought by direction of the acting Governor of the state of Montana. The allegations are directed against two sets of respondents, each set claiming to be the duly appointed and constituted board of highway commissioners of the state. The action was instituted in order to prevent a multiplicity of suits.

The complaint recites the provisions of the State Highway Commission Law (Rev. Codes 1935, sec. 1783 et seq.); the appointment of respondents McGregor, Brown, and Croonenberghs by the then acting Governor of the state, their qualification and their entry into office; the filing of charges by the Governor against them; the hearing of the charges; the orders of removal from office by the Governor; the appointment of respondents O'Hern, Fligman, and Collins to the commissionerships by the Governor; the claim of both sets of appointees to the offices and their pretensions to be the duly appointed, qualified, and acting members of the state highway commission; the fact that the highway commission is charged by law with the performance of numerous recited duties; and the further fact that the titles to the offices are in controversy and should be settled. The Attorney General prayed that this

court decide and determine the relative claims of the different commissioners to the offices claimed by them.

The former proceeding in this court involved only the right of the "old commission," McGregor, Brown, and Croonenberghs, to present certain evidence before the Governor in defense of the charges made against them. The court there decided that the Governor had not accorded them a full hearing, and in effect annulled certain orders of removal theretofore made by the Governor.

The record discloses that on October 28, 1936, the acting Governor presented his accusations and caused notices to be given and hearing held. After proof in support of the charges had been presented, and before any defense thereto had been made, the Governor closed the hearing and made the orders of removal.

It is unnecessary to detail in full all of the matters contained in the charges. It is sufficient to say that they involved the collection of per diem, fees, and expenses incurred by Commissioners McGregor, Brown, and Croonenberghs at times when the commission was not in official session, and the fact that Commissioners Brown and McGregor had authorized Commissioner Croonenberghs to act as traveling representative for the commission and to devote such time as he might be able to in looking after equipment and other business matters of the commission throughout the state. The record further discloses that after such order was made on April 3, 1935, Commissioner Croonenberghs did devote his time almost exclusively to the commission, and did for a period of several months file practically full-time claims for $10 a day for per diem, and for traveling and sustenance expenses; that the total amount collected upon the claims amounted to over $5,000; and that most of the per diem charges and the expense accounts represented days when no meetings of the commission were held. As an example, it was charged that for the month of January, 1936, he collected per diem and expenses for every day in the month, and collected therefor a total of $563.13,

whereas he was entitled to charge but $40 per diem and expenses, or a total of $75, there having been but one meeting of the commission during the month. The evidence discloses that Commissioner Croonenberghs traveled about the state as representative of the highway commission and assumed to act in an official capacity; that, in addition thereto, he traveled extensively without the state; and that for all of the days he was so engaged he collected per diem and expenses.

The charges against McGregor and Brown were to the effect that they collected per diem and expenses for numerous days when the commission was not in session. For example, in the charge against McGregor, there appear numerous items of per diem and expenses involved in visits to different parts of the state of Montana and to distant points without the state, including days spent in California, Nevada, Idaho, Florida, Washington, and other points in the United States.

The charges against Commissioner Brown likewise involved charges for time spent at different points, mostly in the state of Montana. These charges were not so extensive as were the charges against the other two commissioners.

It was charged that Commissioners McGregor and Brown wrongfully authorized Commissioner Croonenberghs to devote full time to the duties of the office of commissioner, and that they thereby aided and abetted in his collection of illegal per diem and expense fees from the state of Montana.

Separate answers were filed by the accused commissioners previous to the beginning of the hearing. In effect the cases were consolidated, so that the evidence with relation to one commissioner could be considered in connection with the charges against the others. Previous to filing answers, demurrers were filed, and numerous motions were made throughout the course of the proceeding. After the decision of this court in the preliminary matter, additional and further answers were filed, and the hearing was resumed and concluded.

Numerous objections and motions were made in the progress of the proceeding. Many assignments of error were

predicated upon adverse rulings in the matter of these motions. Most of these matters we do not deem of serious importance. Attention was directed in the previous opinion to the fact that the power vested in the Governor to remove commissioners was not a judicial power (*State ex rel. Payne* v. *District Court,* 53 Mont. 350, 165 Pac. 294, 295), and that the legislature had not outlined any procedure as to the manner of removal, but had left the same to be determined by the public policy of the state. It was there decided that any method of procedure in conformity with the public policy of the state was sufficient. It is particularly pertinent to have in mind that this court in the *Payne Case,* wherein removal proceedings were prosecuted in court, made the following declaration: ''The statute does not prescribe rules of pleading. It does contemplate that the accusation may be prepared by a layman. In any event, it is sufficient if it clearly and distinctly sets forth the facts constituting the offense, in ordinary and concise language and in such manner that a person of common understanding may know what was intended. (*Woods* v. *Varnum,* 85 Cal. 639, 24 Pac. 843.)'' If the trial courts are not to be held to strict legal procedure in such matters, it must be obvious that the Governor cannot be held to a more formal and technical rule in that particular.

We now say that, in our opinion, the Governor was empowered to proceed in any reasonable manner not in conflict with the policy of the state and to fairly decide what was appropriate in the circumstances.

We think the supreme court of the state of Illinois, in *Wilcox* v. *People ex rel. Lipe,* 90 Ill. 186, stated the true rule in that particular, as follows: ''No mode of inquiry being prescribed for him to pursue, it rests with him to adopt that method of inquiry and ascertainment as to the charge involved which his judgment may suggest as the proper one, acting under his official responsibility, and it is not for the courts to dictate to him in what manner he shall proceed in the per-

formance of his duty, his action not being subject to their revision.''

In the previous opinion, we endeavored to explain just what was there passed upon. The point decided at that time went only to the denial of the Governor to allow the accused to present their defenses. The authority for that holding was based very largely upon the theory of public policy as announced by the legislature, and upon what was said in the case of *State ex rel. Nagle* v. *State ex rel. Sullivan,* 98 Mont. 425, 40 Pac. (2d) 995, 998, 99 A. L. R. 321. It was there emphasized that the courts may not control or coerce the discretion of the Governor. Ample authority was cited in support of that principle. It is unnecessary at this time to reiterate what was therein said. The whole subject as it involved the right of the Governor to remove a public official for cause under statutes that so provide was discussed at great length in that case. Although the matter involved at that time was much more restricted than the issues here presented, the court did assume to treat the whole subject.

In attacking the discretionary power of the Governor in the premises, respondents McGregor, Brown and Croonenberghs have relied upon the following language contained in the *Sullivan Case:* ''This phrase 'for cause,' as used in this connection, means for reasons which the law and sound public policy recognize as sufficient warrant for removal, * * * that is 'legal cause' * * * and not merely a cause which the appointing power, in the exercise of discretion, may deem sufficient.'' From that statement, it is argued that the Governor was without right in the premises to exercise any discretion in the consideration of the issues involved here. The quoted language occurred in the course of a lengthy discussion, and related to, and was used in connection with, the claim that the Governor had a right to remove officials without notice and without hearing. A reading of the complete opinion amply demonstrates that the restricted meaning sought to be put upon the language is not warranted. At another place in the opin-

ion, and in the discussion of the same matter, summary removal without notice and hearing was condemned as improper under the statute; and it was made plain that the discussion was specifically directed toward the denial of the right of the Governor to remove officials for cause, for reasons existing only within his own breast and without notice or hearing. We reiterate what was said in the *Sullivan Case,* supra, as well as the doctrine announced in the *Holt Case,* supra, wherein certain phases of this matter were under consideration.

Much reliance is also placed by respondents McGregor, Brown, and Croonenberghs upon certain other language used in the opinion in the *Holt Case.* There it was said that, in deciding upon the good faith of the accused, the Governor was duty bound to hear all of their defenses, and quotation was made from the case of *State* v. *Healow,* 98 Mont. 177, 38 Pac. (2d) 285, 289, wherein this court announced that it was the duty of the board of railroad commissioners to "hear all, view all, consider all, and then decide." Again we think the complaining respondents seek too literal an application of the language used. The expression used in the *Holt Case* was taken from the *Healow Case.* In that case complaint was made that the commission had considered and heard evidence upon certain matters with relation to existing transportation facilities. The opinion pointed out that the statute with relation to the matter commanded a consideration of such facilities, and that it was the duty of the commission to hear evidence with relation thereto. In the discussion the court said: "The matters prescribed for consideration by the board were general in their character." The same thing may be said of the matters under consideration in the *Holt Case,* supra. In neither instance did the court attempt to direct just how the evidence should be produced or how the cause should be conducted. It seems entirely unwarranted to say that by the use of such language it was intended to direct that either the board in the *Healow Case* or the Governor in the *Holt Case* should be re-

quired to disregard ordinary rules of fair procedure, and to hear and admit everything, however incompetent, irrelevant, or repetitious the same might be.

Vigorous contention is made by respondents McGregor, Brown, and Croonenberghs that they were not permitted to explain at great length each one of the several hundred items. involved in their claims upon which the controverted payments were made. It is impossible and unnecessary to discuss each one of these matters separately. The record discloses that upon the resumption of the hearing after the matter was in this court, the Governor proceeded to allow the respondents to adduce their evidence of good faith, of administrative practice, and value received by the state.

The many pages of the record disclose the fact that long, involved, and meticulous explanations were made of even the most trivial items. A careful examination of the record does not disclose that the Governor abused his discretion or unjustly exercised his prerogatives in attempting to confine the respondents to reasonable explanations of their claims and charges. It seems to us that the explanation of good faith, administrative practice, and value received could have been with propriety and suitable efficacy made once for all of the claims. The respondents claimed that they were actuated at all times by proper motives. Certainly, the reiteration of that fact several hundred times could not serve to emphasize it. Such procedure could only encumber the record. In fact, it did so encumber it that it has made our duty unusually difficult by reason of the necessity of going through more than a thousand pages of record in order to insure that nothing of importance should escape us.

At this point it is pertinent to observe that the respondents McGregor, Brown, and Croonenberghs, constituting the old board, included in their answers a claim of *res adjudicata* as to the moneys collected for per diem and expenses. They pleaded that the Governor was estopped to predicate any action upon the amounts collected, because the claims therefor

were duly allowed by the state board of examiners, of which he was a member. An examination of claims discloses the fact that only a part of such claims were acted upon and approved by Governor Holt. Many of the claims were presented at a time before he became a member of the board, and were considered and allowed or approved by his predecessor in office. Certainly, no element of estoppel as against Governor Holt can be successfully urged on account of the claims allowed before his incumbency.

The general principles of *res adjudicata* and of estoppel, however, are asserted because of the allowance of the claims by the board of examiners. This matter is argued pro and con by the parties. Counsel for the new board rely largely upon what was said by this court in the cases of *Albers* v. *Barnett,* 53 Mont. 71, 161 Pac. 521, 524, and *Carbon County* v. *Draper,* 84 Mont. 413, 276 Pac. 667. Those cases involved the allowance of claims by boards of county commissioners. In the first-cited case, and during the course of the discussion, the court said: ''The board is not a court, and its action is not tantamount to a judgment.'' In the *Draper Case* the court held that moneys paid on account of alleged claims allowed by the board could be recovered in certain instances.

The old board relies upon a statement in the *Draper Case* wherein it was said that the board of county commissioners is a quasi-judicial body, and that its action in examining, settling, and allowing claims in the absence of fraud is conclusive.

In view of the fact that this controversy does not involve an attempt to recover money paid by the state upon claims allowed by the board of examiners, we do not believe that it is necessary to decide that phase of the situation. It must be remembered that the matter here involved was a proceeding by the Governor under the statute to remove the commissioners for cause, and that the specific charges against them involved the wrongful collection of per diem and expenses. We might admit, for the sake of argument (but we do not assume to

decide it here), that the money so collected cannot be recovered, and that the principles of *res adjudicata* and estoppel apply with full force and effect in an action for the recovery of the money, but still we would not reach the situation here. We might assume that the claims were founded upon an erroneous and unwarranted construction of the law and that in fact they were illegal; and we might further assume that the approval thereof by the board and the payment by the state in effect legalized them, at least to the extent of depriving the state of any right of recovery, and still, if the Governor in the exercise of his statutory power of removal believed that the state was imposed upon and that moneys were wrongfully taken from the treasury, such honest belief on his part, after a fair consideration of all of the facts and circumstances, would constitute grounds of action by him to remove the offending commissioners in order that no more claims of that character might be presented and legalized by improper allowance on the part of the state board of examiners. We, therefore, hold that the claims of *res adjudicata* and of estoppel as asserted by respondents McGregor, Brown, and Croonenberghs were not sufficient to bar action by the Governor in the present situation. This conclusion is fortified by appreciation of the fact that the proceedings before the Governor were not strictly judicial, as we point out elsewhere in this opinion.

Before we proceed with a discussion of the highway law and the other statutory provisions with relation to the duties of the highway commission, it is important to understand that the charges were prosecuted under the provisions of the Constitution, which provides that "all officers not liable to impeachment shall be subject to removal for misconduct or malfeasance in office, in such manner as may be provided by law." (Sec. 18, Art. V.)

The word "misconduct," as used in this constitutional provision, has been explained as "any act involving moral turpitude, or any act which is contrary to justice, honesty,

principle, or good morals, if performed by virtue of office or by authority of office." (*State ex rel. Wynne* v. *Examining & Trial Board,* 43 Mont. 389, 117 Pac. 77, 78, Ann. Cas. 1912C, 143.) "Neither our Constitution nor the Codes require that misconduct in office shall be 'wilful' in order to justify the removal of an officer." (*State ex rel. Ryan* v. *Board of Aldermen,* 45 Mont. 188, 196, 122 Pac. 569, 572.) The opinion in the last-cited case quotes the following from Mechem on Public Officers, section 457: "Misconduct, willful maladministration, or breach of good behavior in office do not necessarily imply corruption or criminal neglect. The official doing a wrongful act, or the official neglect to do an act which ought to have been done, will constitute the offense, although there was no corrupt or malicious motive." A quotation was likewise made from Dillon on Municipal Corporations, as follows: " 'Cause for removal' means some substantial shortcoming which renders continuance in office or employment in some way detrimental to the discipline and efficiency of the service, and something which the law and a sound public opinion will recognize as a good cause for his no longer occupying the place. The misconduct for which an officer may be removed must, in general, be found in his acts and conduct in the office from which his removal is sought." (Sec. 477.)

The specific statutory provision upon which the Governor proceeded is as follows: "The members of the state highway commission shall be appointed by the governor and may be removed by him at any time for cause." (Rev. Codes 1935, sec. 1784.) It will be observed that the matter of "cause" is not specifically defined, and that therefore resort must be had to the general principles to which we have just adverted. The members of the old commission strenuously contend that the elements of willfulness and corruption have not been charged. We do not believe that this position can be supported in view of what we have heretofore quoted from the *Payne Case* wherein the informality of such proceedings was emphasized.

A brief history of the Highway Commission Law is neces-

█ sary in order to understand the charges made thereunder. The original Act as it was adopted by the legislature took the place of a previous Highway Commission Law not necessary to discuss here. Chapter 10 of the Session Laws of 1921, Ex. Sess., was a general highway commission law. The Act provided for the creation of a commission to be known as the "state highway commission" and to consist of three members, one member to be known as the "state highway commissioner," and the other members to be known as the "assistant highway commissioners." The Act provided that the state highway commissioner should be a full-time official and should receive a salary of $6,000 per annum, and that the assistant highway commissioners should receive the sum of $10 a day for each day actually engaged in the duties of the office, including time for travel and expenses. The Act clearly contemplated that the full-time highway commissioner should perform a number of independent services designated as the "duty of the commissioner" by the provisions of the Act. It was also provided that certain other duties should be performed by the full commission. In conformity with that Act, the highway business of the state was conducted by one highway commissioner, aided and assisted by the other members, the three then functioning as the commission or official body.

In 1925 the legislative assembly amended the first section of the 1921 Act, which had in the meantime become section 1783 of the Revised Codes. The amendment provided that the state highway commission should consist of three members to be appointed by the Governor, and that each member should receive the sum of $10 a day per diem and expenses. No amendments were made to the other sections of the Act. It becomes manifest, however, when the Act is considered as a whole, as it must be, that certain of the other provisions were automatically amended so as to give the commission full power and authority to the exclusion of a "highway commissioner" as designated in the old Act. Unless this view is taken, the Act is obviously conflicting and confusing. For instance, in

many of the sections the word "commissioner" still appears in such a manner that it is plain that only the commission could function. The amended Act makes no distinction between commissioners. It provides that the commission shall choose one of its members as chairman, and shall appoint an engineer and employees, and that the office of the commission shall be maintained at the state capitol building. Some of the provisions of the unamended sections provide that the "commissioner" shall do certain things. For instance, by the terms of section 1784, Revised Codes, it was provided that the state highway commissioner shall appoint an engineer. Thus it will be observed that the later enactment provides that the engineer and all the employees are to be appointed by the commission, whereas under the old Act the engineer was to be appointed by the commissioner. Again, in section 1785, it is provided that the commissioner shall be furnished with a suitable office in the capitol. Certainly it was not intended that two sets of employees and two offices were to be maintained. Similar provisions appear throughout the Act. Again, in sections 1785 and 1786, provision was originally made for the preparation and submission of plans, specifications, contracts, estimates, etc., by the commissioner and for reports to the Governor on certain matters. No amendment of the sections was made to designate which one of the commissioners was intended to have these functions.

A consideration of the sections as they now appear in the statute brings one to the inevitable conclusion that it was the intention of the legislature to abolish the full-time commissionership and to vest the commission as a whole with all of the duties, powers, and prerogatives that were conferred upon the highway commissioner, as well as those conferred upon the commission by the original Act. This construction so forcibly impressed itself upon the code commissioner that in the current revision of the Codes he placed a notation after section 1784, Revised Codes of 1935, to the following effect: "Note.— The duties and powers of the state highway commissioner as

set out in this section and the following sections would seem to devolve on the state highway commission in view of section 1783 as amended by Chapter 129, Laws of 1925.''

Our consideration of all of the various enactments of the legislature leading up to the present chapter as it is contained in the Codes has convinced us that, as the law now stands, all three of the highway commissioners stand with equal powers and functions, and that it was the intention of the legislature to do away with the separate office of highway commissioner and to place all of the authority in the commission proper. Any other construction would lead to confusion and would render the law unworkable.

For instance, by section 1788, Revised Codes, the commissioner was authorized to formulate certain rules and regulations necessary for the government of the commission. All commissioners having equal authority, a construction that a commissioner could perform that function would obviously mean that each commissioner could formulate a set of rules and regulations for the government of the commission, so that there would be three sets of rules the provisions of which might be in conflict, and that the operation of the commission as a governmental body would be rendered entirely impossible. It is our duty to place upon the chapter a construction that will make it workable in conformity with apparent legislative intent. (Sec. 10520, Rev. Codes; *Barney* v. *Board of Railroad Commrs.*, 93 Mont. 115, 17 Pac. (2d) 82; *Great Northern Utilities Co.* v. *Public Service Com.*, 88 Mont. 180, 293 Pac. 294.) We believe that the only fair construction that can be placed upon the language of the chapter as it now exists is that the commission as a whole must function in all official matters in exactly the same manner that other commissions are required to function under similar laws, and notwithstanding the unimportant but obvious ambiguities mentioned.

Because some of the services for which Commissioner Croonenberghs—after authorization by the other two members of the board — collected compensation were rendered in connection

with the State Highway Patrol Law (secs. 1741.12 et seq., Rev. Codes), it is necessary to observe that the law governing that department provides that the "Montana highway patrol" shall be under the control and supervision of the Montana highway commission. The sections provide for general supervision of the patrol department by the highway commission, for the appointment of a highway patrol supervisor by the commission, for the selection of other employees of the department, and for the general conduct of the highway patrol by the commission, and not by any individual commissioner.

The charges here under consideration are to the effect that the commissioners collected per diem and expenses for days when the commission was not in session, and for individual official services rendered by each commissioner when he was not in attendance upon a regularly convened meeting of the commission, and when the commission was not functioning as such. The answers of the commissioners admit the acceptance of the amounts, and seek to justify the same on the ground that each commissioner did render legal services individually to the state, and that therefore he had a right to collect for the same; and, further, that the construction of the law which formed a precedent for the action of the accused commissioners had found its inception in a custom and practice established by the board prior to the incumbency of these commissioners; and still further, that the services were rendered in good faith and that the state received value for such services. This brings us, then, to the question whether the commissioners under the law were vested with individual authority and had a right to function when the commission was not in session, and to collect compensation and expenses therefor.

The general rule of law is that public officials can only ▉ claim compensation for services rendered where the compensation is provided by law, and that where no compensation is so provided the rendition of such services is deemed to be gratuitous. (29 C. J. 572; 46 C. J. 1014.) Statutes relating to the fees or compensation of public officers must be strictly

construed in favor of the government, and such officers are only entitled to what is clearly given by law. (46 C. J. 1019; see, also, *Holcombe* v. *Kennedy*, 158 Ark. 585, 251 S. W. 7; *Bradley County Road Imp. Dist.* v. *Wilson*, 168 Ark. 204, 269 S. W. 583; *King* v. *Guilford County*, 152 N. C. 438, 67 S. E. 919; 1 Dillon on Municipal Corporations, 5th ed., sec. 426; *Delaplane* v. *Crenshaw*, 15 Gratt. (Va.) 457.)

A highway commission board can act officially only in a convened session with the members or a quorum thereof present. (29 C. J. 562; 46 C. J. 1934.) In *Wight* v. *Meagher County Commrs.*, 16 Mont. 479, 41 Pac. 271, 272, it was said: "No compensation can be recovered unless provided by law. Unless, therefore, compensation is by law attached to the office, none can be recovered." And in *United States* v. *Shields*, 153 U. S. 88, 14 Sup. Ct. 735, 736, 38 L. Ed. 645, it was said: "Fees allowed to public officers are matters of strict law, depending upon the very provisions of the statute. They are not open to equitable construction by the courts, nor to any discretionary action on the part of the officials." (See, also, *Peterson* v. *City of Butte*, 44 Mont. 401, 407, 120 Pac. 483, Ann. Cas. 1913B, 538.)

It has long been settled law in this state that boards of county commissioners cannot function unless in session with a majority present. This matter was definitely explained in the cases of *Smith* v. *Zimmer*, 45 Mont. 282, 125 Pac. 420, and *State ex rel. Urton* v. *American Bank & Trust Co.*, 75 Mont. 369, 243 Pac. 1093. Much discussion of this principle and full explanation thereof occurred in the cases of *State ex rel. Payne* v. *District Court*, supra, and *State* v. *Story*, 53 Mont. 573, 165 Pac. 748. It is important to observe that in the *Story Case* this court called attention to the fact that county commissioners under the general law were given authority to manage and care for the highways; that in that behalf they could do, or cause to be done, whatever might be necessary; and that, unless payment therefor was authorized by statute, none could be collected. Attention was directed to the fact

that a special statute had been enacted to provide for compensation for commissioners for the inspection of the condition of contract construction work on highways and bridges, and for incidental expenses incurred therein.

The rule thus declared with relation to boards of county commissioners has likewise by this court been declared applicable to school boards. In the case of *Day* v. *School Dist. No. 21,* 98 Mont. 207, 215, 38 Pac. (2d) 595, 598, the rule with regard to boards of county commissioners was discussed and the court said: "With respect to the application of such a rule there is no logical distinction between a board of county commissioners and a school board. Indeed, this court has already held that the same principle is applicable in the case of a school board. In *O'Brien* v. *School Dist. No. 1,* 68 Mont. 432, 219 Pac. 1113, 1114, it was held that a 'school district is a public corporation * * * with limited powers. * * * Its business is transacted by a board of trustees, * * * and among the powers expressly conferred upon the board is the power to employ or discharge teachers. * * * To give validity to the business of the board it must be transacted at a regular or special meeting, * * * and the trustees must then act as a board.' " (See, also, *State ex rel. School Dist. No. 29* v. *Cooney,* 102 Mont. 521, 59 Pac. (2d) 48.)

Thus it will be observed that it is the settled law of this state that with relation to boards of county commissioners and school boards, the individual members of the boards cannot, in the absence of special statutes, separately perform official functions, and that official action can only be consummated by such a board when a majority of the members are present. County commissioners may, as we have indicated, perform certain functions, but can only collect compensation where there is a specific provision therefor.

A careful study of the contentions of the members of the old commission leads to the conclusion that they now contend that not only was the Governor required by this court to hear all of their defenses, but that he was likewise required to be-

lieve them and to give full credit thereto to the extent that it was incumbent upon him to acquit them upon the charges. It must be remembered that, although this court held that evidence in support of the defenses of administrative practice, good faith, and value received should be heard by the Governor, by no construction of the language employed or distortion of the principle announced can it be said that the court held that the Governor was in any manner restrained or impeded from the free and fair exercise of his constitutional and statutory authority as Governor.

Evidence was introduced to show that former members of the commission had charged and collected per diem and expenses on account of services rendered at times when the board was not in session. Much reliance was placed upon this fact. In support of the contentions, reports of the highway commission made to the Governor and the legislative assembly were introduced. It is unnecessary for us to evaluate all of this evidence, as we shall hereafter point out. We call attention to the fact, however, that there is nothing in the various reports to indicate just what items of the expenditures were for services rendered in board meetings, and what part represented services rendered by board members apart from time consumed in meetings.

The reports, though, are somewhat illuminating. In the report made for the period ending December, 1928, it was shown that administrative commission expenses for sixteen months amounted to a total of $4,058.41. This was explained as the total cost of the "three-man per diem commission." Again in the report for the period ending December, 1930, the cost of the "three-man per diem commission" for forty months was listed at $9,917.39; and in the report of the commission for the period ending December, 1932, a table of the expenses of the commission was appended, showing that the whole cost of the highway commission of three members for the period of five years and four months amounted to less than $17,000.

Evidence was adduced to show that former members of the commission had during their incumbency rendered some independent separate service as commissioners and had charged therefor. A careful study of the record, however, does not disclose that a positive and consistent practice had been established in that particular. The amounts collected by some of the members were insignificant and by others somewhat more substantial; but there is nothing in the record in the way of testimony given by witnesses, or in the nature of exhibits, that can be fairly said to establish a general administrative practice of allowing commissioners to devote even a substantial part of their time to such duties and to collect therefor.

Commissioner Croonenberghs was the first one, and in fact the only commissioner, who ever attempted after the time of the 1925 change in the law, to devote anything like full time to such duties. The record discloses that Commissioner McGregor charged more time against the state, and charged considerably more therefor than had most other previous incumbents.

The bills of Commissioner Brown indicate that he charged for more services than had generally been charged against the state by other previous incumbents, although his claims in the aggregate were much less than were the claims of either of his associates. It is apparent that the claims filed by Commissioner Croonenberghs for practically full-time service from time to time were the first full-time charges lodged against the state since the days of the so-called one-man commissionership.

The questions whether the policies pursued were sufficient to ██ build up an administrative practice and thereby justify charging therefor, and whether the state received sufficient value to vindicate the commissioners in making the claims, were questions for the Governor. The statute which gives him the power to remove provides for no appeal from his decision. In these matters he was made judge and jury. It was his right, if he saw fit to adopt the principles heretofore announced by

this court as applicable to the matter. In *State ex rel. Nagle* v. *Stafford*, 97 Mont. 275, 34 Pac. (2d) 372, 378, it was said: "It is elementary that a custom cannot vary the terms of, or operate to abrogate or repeal, the general statute. * * * 'A course of practice founded upon a mistaken construction of a statute cannot have the force of law, no matter how long it has continued, unless there be a reasonable doubt as to the meaning of the particular provision upon which the practice is founded. Contemporaneous construction cannot abrogate a plain provision of law, or fritter away its obvious sense.' "

In *State ex rel. Wynne* v. *Examining & Trial Board*, supra, it was said: "It is contended for the relator that he acted in entire good faith; that he thought he had a legal right to charge mileage. * * * But he cannot be heard to make such claim. Mr. Justice Hunt, speaking for this court, in the case of *Leggatt* v. *Prideaux*, 16 Mont. 205, 40 Pac. 377, 50 Am. St. Rep. 498, said: 'That the justice of the peace believed he had a legal right to charge the fees he did, and acted in good faith in taxing and collecting the fees, constitute no defense. It would be most dangerous to the welfare of society if an officer elected to administer the law could violate it to his own pecuniary advantage, and escape the consequences of his act by pleading ignorance of the statute he had violated. That ignorance of the law is no excuse is a postulate of law; but, unless the maxim is upheld, there would be innumerable problems presented to courts, and he who knew the least might fare the best; or, as is said by the Supreme Court of California, in *People* v. *O'Brien*, 96 Cal. 171, 31 Pac. 45: "The denser the ignorance, the greater would be the exemption from liability." ' * * * The relator gains nothing by reason of the fact that other officers may have made similar charges. That system may be in vogue; but if such be the case, the system is vicious and wrong. * * * The system is fundamentally wrong, and no measure of participation therein by others can change the fact. It is unfortunate, perhaps, for the relator, that he is the first to suffer from an overturning of the

system, but courts cannot be influenced by such considerations."

Again, in the case of *State ex rel. Rowe* v. *District Court,* 44 Mont. 318, 325, 119 Pac. 1103, 1107, Ann. Cas. 1913B, 396, this court quoted with approval the following from a Pennsylvania case (*Coates* v. *Wallace,* 17 Serg. & R. 75) : "Ignorance of the law will not excuse in any case; and this principle is applicable, and with irresistible force, to the case of an officer selected for his capacity, and in whom ignorance is unpardonable. The very acceptance of the office carries with it an assertion of a sufficient share of intelligence to enable the party to follow a guide provided for him with an unusual attention to clearness and precision. On any other principle, a conviction would seldom take place, even in cases of the most flagrant abuse; for pretexts would never be wanting. Sound policy, therefore, requires that the officer should be held to act at his peril, and we are of the opinion that the absence of a corrupt motive, or the existence of an agreement by the party injured, furnishes no justification for doing what the law forbids."

The Governor could have relaxed the severity of these holdings in the application thereof to this case, but the fact remains that he did not do so. In so refusing, he cannot be said to have been acting without right.

Since we have indicated that each individual member of the commission was not an independent officer vested with separate powers, and that the commission could only act as a body or board—or, at least, that compensation was limited to such services—it follows that the per diem and the expenses for individual services were not, as a necessary consequence, legally collectible under the law. The proposition just stated could have been decided upon the record made by the Governor at the first hearing, and before this court in the special proceeding, but for the fact that it was there held that the public policy of the state in that particular gave the accused commissioners the right to be heard in explanation of the charges.

We have indicated that the proceedings were not judicial but that the Governor was acting in his executive capacity; that the courts could not impose upon him any manner of strict procedure; and that the legislature, by failing to do so, left him free to adopt any fair method of procedure he might deem proper. It is equally fundamental and true that although the Governor was required to hear the defenses of the accused in some proper manner, he could not be compelled to believe what he heard, and that no court could compel him to act in any certain manner with relation thereto. It was his duty, as well as his right, to hear and decide. In the discharge of this duty, he was acting not only under the statute which give him power to remove, but also under the Constitution of the state. Article VII, section 5, of the Constitution provides: "The supreme executive power of the state shall be vested in the governor, who shall see that the laws are faithfully executed." In discussing this provision of the Constitution, this court used the following language: "Nor is there the slightest doubt that, as he must determine, so he alone can determine. * * * Neither the court nor the local authorities can be the arbiter in such a manner. Not this court, for it exercises judicial functions alone; and not the local authorities, for, although the enforcement of the law is primarily with them, public opinion and official attitude may be dominated by the forces who would take the law into their own hands." (*In re McDonald,* 49 Mont. 454, 143 Pac. 947, 949, Ann. Cas. 1916A, 1166, L. R. A. 1915B, 988.) And again this court said: "The Governor is at all times amenable to the Constitution and laws of the state. They are the charters of his powers, and in them he must find the authority for his official acts. While he may not exceed their bounds in any instance, he may invoke any remedy provided by them for the purpose whenever the exigencies of a particular case call for it." (*Herlihy* v. *Donohue,* 52 Mont. 601, 161 Pac. 164, 166, Ann. Cas. 1917C, 29, L. R. A. 1917B, 702.)

150

And so we say that the Governor had both constitutional and statutory authority to act in the present situation. Courts have almost universally upheld the right of the Governor in similar circumstances with the possible exception of instances wherein the Governor was held to have acted arbitrarily and capriciously because of an entire lack of substance in the charges or in the evidence to support them. We do not hold, it should be understood, that the Governor is vested with arbitrary powers. We only hold that the powers here reposed in him and exercised by him in this proceeding are of a discretionary character, and that his action could be subject to our review only if it should clearly appear from the record that he acted with no facts to move his discretion, and therefore in an arbitrary and capricious manner. This record, however, shows that he had facts to move his discretion. See the following citations for a full discussion of this matter: *People ex rel. Johnson* v. *Coffey*, 237 Mich. 591, 213 N. W. 460, 52 A. L. R. 1, *Cooke* v. *Iverson*, 108 Minn. 388, 122 N. W. 251, 52 L. R. A. (n. s.) 415, and *Humphrey's Executor* v. *United States*, 295 U. S. 602, 55 Sup. Ct. 869, 79 L. Ed. 1611.

No better statement of the law can be found anywhere than that contained in the Illinois case of *Wilcox* v. *People*, supra. Although that case mentions the power as ''quasi judicial,'' nevertheless the language is particularly in point. It was said: ''The court will only inquire whether the officer has acted within the power, and will not attempt to substitute its own judgment or discretion for that of the officer, and will not supply any other conditions to the exercise of their discretionary power than such as the law has provided. * * * In *People* v. *Stout*, 19 How. Prac. [N. Y.] 171, it was held: 'Where the right to remove a public officer is vested, by legislative or constitutional enactment, in a particular person or body *for cause,* or upon notice to the incumbent, and no right of appeal or review has been expressly given by law, this court has no power or authority to inquire into the discretion exercised by such person or body, or in any manner to review

such removal.' In *State ex rel. Attorney General* v. *Doherty,* 25 La. Ann. 119 [13 Am. Rep, 131], it was said, in the opinion of the court: 'The grant of power to the executive to remove an officer for a certain cause, implies authority to judge of the existence of that cause. The power vested exclusively in executive discretion can not be controlled in its exercise by any other branch of the government. To institute the inquiry as to the correctness of the cause for which the Governor removed the defendant, would be a direct attack upon the independence of the executive, and a usurpation of power subversive of the Constitution.' And see, also, to the like effect, *Attorney General ex rel. Taylor* v. *Brown,* 1 Wis. 513; *Keenan* v. *Perry,* 24 Tex. 253. Any decision that may be found to the contrary is exceptional. The doctrine of the cases cited is the strongly prevailing authority upon the subject.''

As was pointed out in the former opinion herein, this court has been particularly and consistently careful to avoid any attempt at usurpation of power belonging to another department of government. The cases cited in that opinion all go to that effect, and such authority is everywhere recognized. One of the most impressive phrases employed by the Illinois court in the foregoing quotation is the following: ''The grant of power to the executive to remove an officer for a certain cause, implies authority to judge of the existence of that cause.'' That statement is exactly in line with what this court has said from the inception of our government. With that principle in mind, it is wholly unnecessary to review the evidence in minute detail. No good purpose would be served by such a review when it is understood that at the end thereof we should still be confronted by the principles just enunciated.

The theory of encroachment by one department of the state upon the prerogatives of another has always constituted a controversial subject among laymen, but there is very little divergence of opinion in judicial circles. The courts have very generally recognized the division of power so emphatically

declared by the federal Constitution and most of the state Constitutions. This, however, is not strange, because the members of the judiciary can only be drawn from a class or profession whose duty and pride it is to study and understand governmental principles and their practical application. Only men trained in the law and admitted to practice after due examination may be judges. All of this presupposes more than ordinary understanding of governmental principles. Successful candidacy for official position in other departments of government may or may not require such training or qualifications as a prerequisite to service. Charming personality or unusual political attributes may, and often do, serve as substitutes for training and qualification.

The governorship is a constitutional office and a continuing ▮▮▮ one. Under our Constitution, the power and authority are never allowed to lapse. When one incumbent moves out of the office, the powers, functions, and duties devolve upon another. The people of the state provided for every such contingency. It makes no difference, from a legal point of view, whether the incumbent is invested with the power for days or years. It is his to exercise for whatever time he is in office. Neither long service nor temporary incumbency can affect the legality of an act. The acts of a Governor must of necessity have behind them all of the power and force of the constitutional and statutory provisions in effect at the time. If such were not the case, the very foundation principles of our Democratic form of government would be imperiled.

With these principles in mind, we are forced to recognize ▮▮▮ that the Governor was made the arbiter of this controversy. The decision was his. He may have decided it in a manner different from what might otherwise have been our decision. It is unnecessary for us to weigh, consider, or appraise the testimony. It would be a task of supererogation. Recognizing as we do the division of powers in the Constitution, so jealously guarded, we might say of the Governor's finding as Voltaire said when commenting upon the statements

of another: "I wholly disapprove of what you say, but will defend to the death your right to say it." By that we do not mean to say, as a matter of abstract fact, that the Governor was wrong, nor by the same token do we intend to say that he was right. We say that what he said was right because he had a right to say it; and with that right we can have no quarrel.

The question of state policy as declared by the legislature was discussed in the previous opinion. It may not be without interest to say that the state of Montana, through its legislative authority, has recently emphasized the state policy with regard to certain powers and duties of the Governor, the executive officer of the state, by enlarging and emphasizing his powers in order that responsibility may be more readily placed by the people of the state. We refer to the enactment of H. B. 65 by the current legislative assembly.

It may not be out of place either to call attention to the fact that today there is much discussion relative to the rights of courts to function in certain governmental affairs. Certainly, the prevailing debates do not tend to invite courts to arrogate to themselves more powers than they are constitutionally entitled to exercise. Government by courts has been generally and properly condemned. We doubt whether there has been so flagrant a use of such power as the public generally believe. We do say, however, that in the state of Montana the courts have scrupulously and diligently refrained from interfering with the free operation of other departments of state.

Neither do we consider it out of place to call attention to the fact that there has been some division of sentiment within the ranks of judges themselves as to the right to exercise judicial powers in certain respects. In the reports of this court will be found many dissenting opinions by Justices who have vehemently contended, and who still contend, that the judicial power of the court has been improperly exercised in a review of jury verdicts. As illustrative of this, see the dis-

senting opinions in the following cases: *Mason* v. *Madson,* 90 Mont. 489, 4 Pac. (2d) 475; *In re Wray's Estate,* 93 Mont. 525, 19 Pac. (2d) 1051; *Wise* v. *Stagg,* 94 Mont. 321, 22 Pac. (2d) 308; *Harrington* v. *H. D. Lee Mercantile Co.,* 97 Mont. 40, 33 Pac. (2d) 553; *Tanner* v. *Smith,* 97 Mont. 229, 33 Pac. (2d) 547; *Jewett* v. *Gleason,* ante, p. 63, 65 Pac. (2d) 3; *Cowden* v. *Crippen,* 101 Mont. 187, 53 Pac. (2d) 98; *Boepple* v. *Mohalt,* 101 Mont. 417, 54 Pac. (2d) 857; *State* v. *McWilliams,* 102 Mont. 313, 57 Pac. (2d) 788; *Doyle* v. *Union Bank & Trust Co.,* 102 Mont. 563, 59 Pac. (2d) 1171; *Herrin* v. *Herrin,* 103 Mont. 469, 63 Pac. (2d) 137.

It must be understood that the above-cited cases involved matters in which the Constitution and the statutes specifically authorized appeals to this court and contemplated the review by this court, whereas in the present instance there is no appeal provided by the Constitution, statute, or judicial precedent. With that thought in mind, how can it be contended that the courts are without power to set aside verdicts of juries that are returned in the judicial department and that are without supporting evidence, and at the same time be contended that this court has the power to set aside and hold for naught an official finding and determination of the Governor—head of a coordinate branch of the government—upon a proposition unequivocally committed to his jurisdiction and discretion without statutory appeal or review?

We therefore hold that the former highway commissioners, Harry J. McGregor, Rockwood Brown, and L. J. Croonenberghs, were by the Governor of the state of Montana lawfully removed from their offices and are no longer entitled to hold such offices; and that D. L. O'Hern, Fred A. Fligman, and Thomas C. Collins were properly and lawfully appointed thereto and now are the duly appointed and qualified highway commissioners of the state of Montana. Let judgment be entered accordingly.

ASSOCIATE JUSTICES ANDERSON and MORRIS concur.

MR. CHIEF JUSTICE SANDS:

I emphatically concur in the subjoined dissenting opinion of Mr. Justice Angstman.

The old commissioners, McGregor, Brown, and Croonenberghs, are charged with graft by ex-Governor Holt for following the prevailing practice of charging and collecting fees and mileage in the discharge of official duties. The Governor through his attorney in open court disclaimed any charge of corruption on the part of the commissioners. No testimony whatever disclosed any fraud. This court held in the first case involving the controversy, decided only last December, that good faith in accepting fees charged to be illegal was an absolute defense. On this hearing, good faith was established by proof of preceding custom of other commissioners, by the approval of the legislature of similar Acts, and by the Governor and Attorney General when they put their O. K. on these claims before they were paid. If there was graft, the Governor and Attorney General were parties to it and equally as guilty as the commissioners. For the Governor to approve the claims and then kick the recipient out of office for accepting them presents a strange situation, but not stranger than the fact that this court first held that the commissioners could show that they acted honestly and then, after they did so, without any proof to the contrary, this court is upholding his inconsistent and purely arbitrary decision. I cannot approve a conviction of fraud where fraud is expressly disclaimed. I cannot approve a conviction of graft where the judge and jury (the Governor) approved the crime charged before it was committed. I cannot brand these men as criminals without charge or proof of any crime. Surely, justice is wearing a veil in this case.

MR. JUSTICE ANGSTMAN, Dissenting:

There is much in the majority opinion concerning which I find it unnecessary for me to express either approval or dis-approval. On at least some questions I think the majority are

in error. It is now settled by the decisions of this court that when the removal of an officer is sought "for cause" there must be notice and hearing. (*State ex rel. Nagle* v. *Sullivan,* 98 Mont. 425, 40 Pac. (2d) 995, 99 A. L. R. 321; *State ex rel. Holt* v. *District Court,* 103 Mont. 438, 63 Pac. (2d) 1026, 1028.) "For cause" means "for reasons which the law and sound public policy recognize as sufficient warrant for removal * * * that is, 'legal cause' * * * and not merely a cause which the appointing power, in the exercise of discretion, may deem sufficient." (*State ex rel. Nagle* v. *Sullivan,* supra.) As I read the majority opinion, it is there held that the fees collected for work not performed at a session of the commission were unauthorized and illegal. Reliance is placed largely upon the cases of *State ex rel. Payne* v. *District Court,* 53 Mont. 350, 165 Pac. 294, and *State* v. *Story,* 53 Mont. 573, 165 Pac. 748. But those cases dealt with a statute which provided that "each member of the board of county commissioners is entitled to eight dollars per day for each day's attendance on the sessions of the board, and ten cents per mile for the distance necessarily traveled in going to and returning from the county seat and his place of residence, and *no other compensation must be allowed.*" (Rev. Codes 1907, sec. 2893.) Here we have no such statute. The statute involved here reads: "Each commissioner * * * shall receive as compensation to be paid out of the highway fund the sum of ten dollars ($10.00) per diem for each day actually engaged in the duties of his office, including his time of travel between his home and place of employment of such duties, together with his traveling expenses while away from his home in the performance of the duties of his office." (Sec. 1783, Rev. Codes 1935.)

As pointed out in the majority opinion, the highway commission laws as they now stand are somewhat confusing. Many of the provisions refer to the highway commissioner, whereas under existing laws there are three commissioners. In considering the question whether the fees involved here

were or are illegal, it is important that we look to the statutes to ascertain the duties of the commission or commissioners as the case may be. The statute, as above noted, authorizes per diem to a highway commissioner for time engaged in the duties of his office including time of travel between his home and the place of employment of such duties, and not, as in the county commissioner statute, allowing per diem only ''for each days' attendance on the sessions of the board.''

Section 1786 provides: ''In addition to his other powers and duties, the state highway commissioner shall compile statistics relative to public highways throughout the state, and shall collect all information in regard thereto deemed expedient. He shall investigate and determine upon various methods of road construction adapted to different sections of the state, and as to the best methods of construction and maintenance of roads, bridges, road markers and shall investigate and determine upon such other information relating thereto as he shall deem appropriate and necessary. He may be consulted at all reasonable times by county officers having care and authority over highways and bridges and shall advise such officers relative to the construction, repair, altering or maintenance of the same, and shall furnish such other information and advice as may be requested by persons interested in the construction, maintenance and marking of public highways, and shall at all times lend his aid in promoting highway improvement throughout the state.''

Section 1788 in part provides: ''The state highway commission is hereby authorized to, and shall, in conjunction with the board of county commissioners of the several counties in the state, designate such public roads in the state as shall be classed as state highways and subject to improvements under the provisions of said federal aid road Act of Congress, and the state highway commission in conjunction with the board of county commissioners shall also formulate necessary rules and regulations for the construction, repair, maintenance and mark-

ing of state highways and bridges, and may provide for local supervision in such cases.''

I believe, whether we regard these statutes as prescribing the duties of the commission or of the commissioners, that the rule that they are only to receive per diem when actually attending sessions of the board cannot be applied to the members of this board. Must the highway commission as a body travel about the state in the performance of these duties and multiply by three the cost of obtaining the information required by law? As above noted, the commission or commissioner as the case may be must hold consultation with county officials and must co-operate with boards of county commissioners. Can it be possible that the legislature intended that the highway commission should sit in its office in Helena and there hold consultation with the county commissioners over the state? This court has held otherwise in *Guillot* v. *State Highway Com.*, 102 Mont. 149, 56 Pac. (2d) 1072, 1075, where it said: ''While the law declares that the 'office' of the commission shall be maintained at the State Capitol Building (Rev. Codes 1921, sec. 1783, as amended by Chapter 129, Laws 1925), it is not conceivable that the legislature intended that the administration and supervision of the 'construction, reconstruction, betterment and maintenance' of upwards of 5,000 miles of state and federal main highways, and their connections forming a network over the vast area of the state, should be conducted exclusively from that office.'' Must all of the county commissioners of the state come to Helena to consult the highway commission? Obviously not. This would multiply the cost to the taxpayers several fold. Is it not more reasonable and economical to have one member of the highway commission consult the various county commissioners throughout the state and perform the duties required by the above statutes and thus save to the taxpayers the expense of the entire commission traveling about the state?

Under section 1789, the commission may employ necessary field help and fix their compensation. That section provides:

"The highway commission shall employ office and field help as it shall deem necessary and the compensation for all such employees shall be determined by the state highway commission and paid out of the state highway fund in the same manner as other state·employees are paid." Can it be that the commission may employ field help at state expense to assemble the necessary information upon which the commission may take official action, but that it is unlawful to have a member of the commission personally assemble the same information? I think it was clearly contemplated by the legislature that the highway commission may, if it sees fit, delegate to one of its members power and authority to collect the necessary information upon which the commission subsequently acts, or otherwise divide such duties among the three commissioners.

It is well settled in this state that when an officer, board, or commission is given certain duties and no definite means are prescribed for carrying them out, he or it may employ any reasonable method. (*Morse* v. *Granite County*, 44 Mont. 78, 119 Pac. 286; *Fisher* v. *Stillwater County*, 81 Mont. 31, 261 Pac. 607; *State ex rel. Blair* v. *Kuhr*, 86 Mont. 377, 283 Pac. 758; *Simpson* v. *Silver Bow County*, 87 Mont. 83, 285 Pac. 195; *Ransom* v. *Pingel*, ante, p. 119, 65 Pac. (2d) 616.) The court in speaking of the implied powers of the state highway commission in *Guillot* v. *State Highway Com.*, 102 Mont. 149, 56 Pac. (2d) 1072, 1076, said: "Where the legislature sees fit to confer upon a board or commission such broad general powers, the repository of the power is vested with discretion in choosing the means and methods of accomplishing the result expected, and, in the absence of fraud or manifest abuse of that discretion, its determination is conclusive. (*State ex rel. Pew* v. *Porter*, 57 Mont. 535, 189 Pac. 618; *State ex rel. Pigott* v. *Porter*, 57 Mont. 539, 189 Pac. 619.) The authority vested in the commission to expend millions of dollars per year for the construction, reconstruction, betterment, and maintenance of thousands of miles of highways and roads, imposes upon the commission the duty to expend these vast

sums effectively through the use of the 8 per cent. permitted to be used for administrative and engineering purposes. Such broad granted authority confers upon a commission, by implication, all necessary authority and power to render the granted powers fully efficacious and the performance of such duties effectual.''

I think the fees involved here were proper and legitimate, and that being so, there was no legal cause existing for the removal of the commissioners on account of the collection of illegal fees. But if we assume that the fees are and were illegal, we are met with the further question whether the commissioners were proceeding in good faith within the meaning of section 11702, which provides in part: ''Provided, if the charge be for the charging and collecting of illegal fees or salaries, the trial must be by jury, if the defendant so demands, and conducted in all respects and in the same manner as the trial of an indictment for a misdemeanor, and the defendant shall be entitled, as a matter of defense, to offer evidence of, and the jury under proper instructions shall consider, his good faith or honest mistake, if any be shown, and the value received by the state, county, township, or municipality against whom the charges or fees were made.'' This court has held that the provisions of section 11702 contain the legislative policy of this state when there is an attempt to remove a public officer on a charge of collecting illegal fees.

In the case of *State ex rel. Holt* v. *District Court*, 103 Mont. 438, 63 Pac. (2d) 1026, 1029, relating to these identical proceedings, this court said: ''Under our Constitution and laws a proceeding might, in a proper case, be brought under section 11702 for the removal of a highway commissioner, that being an office created by the legislature and not by the Constitution. In such a proceeding evidence of good faith may be heard in defense. To now say that the same evidence may not be heard in a proceeding before the Governor for the removal of a public officer is to ignore the declaration of the legislature on the question and to substitute the notion of the judge

or judges.'' Did the removed commissioners proceed in good faith or under honest mistake and did the state receive value for the fees collected? As above pointed out, the statutes are, to say the least, ambiguous. That the removed commissioners honestly believed they had a right to the fees in question there can be no doubt.

The record shows that our statutes have been construed by the predecessors in the office of highway commission as authorizing fees for the performance of duties other than those transacted at commission meetings. Thus one of the predecessors presented and received payment for 15 days' service in 1929 and 13 days in 1930 for duties other than those performed at a meeting of the board. In 1926 another presented and received payment for 15 days for like service. In 1927 a claim for 10 days' services was allowed and paid for service aside from those for attending meetings. Another commissioner presented and received payment in 1929 for 14 days and in 1930 for 24 days' similar service. Still another received payment for 3 days in 1933 for services performed without a meeting. This was well known to the legislative assembly and that body acquiesced in that interpretation of the law. It is true that previous commissioners did not charge or receive as much fees in the aggregate as did Mr. Croonenberghs, but the necessity for increased services was shown to have arisen because of added duties occasioned by the establishment of the state patrol which under the law is under the jurisdiction of the highway commission and because of the expansion of the highway program in Montana. Moreover, the state board of examiners, a constitutional board (sec. 20, Article VII, of the Constitution), consisting of the Governor, Secretary of State, and Attorney General, with power to examine all claims against the state, had approved like claims prior to the time that the contract was made with Mr. Croonenberghs. In fact, it approved all the claims here involved and many of them when acting Governor Holt was a member of that board, he joining in their approval. If ever it could be

said that officers proceeded in good faith within the meaning of section 11702, then the commissioners here did so. What was said in *Miller Ins. Agency* v. *Porter*, 93 Mont. 567, 20 Pac. (2d) 643, 646, has application here. This court there said: "The practical construction, however, of the statute as adopted by the various boards of examiners of the state over a long period of time has been to the effect that these policies are not within the meaning of the term. It is the settled rule that the practical interpretation of an ambiguous or uncertain statute by the executive department charged with its administration is entitled to the highest respect, and, if acted upon for a number of years, will not be disturbed except for very cogent reasons. (*State ex rel. Public Service Com.* v. *Brannon*, 86 Mont. 200, 283 Pac. 202, 67 A. L. R. 1020; see, also, 25 R. C. L. 1043.) The contemporaneous and long-continued practice of officers required to execute or take special cognizance of a statute, is strong evidence of its true meaning. And if the legislature by its inaction has long sanctioned a certain construction, language apparently unambiguous may be given by the courts such construction, especially if the usage has been public and authoritative." In *Guillot* v. *State Highway Com.*, supra, this court said: "While administrative practice does not avail to overcome a statute so plain in its commands as to leave nothing for construction, such practice, if consistent and unchallenged, will be overturned only for very cogent reasons, if the scope of the command is indefinite and doubtful, particularly when the practice has received congressional or legislative approval." To the same effect is *Murray Hospital* v. *Angrove*, 92 Mont. 101, 10 Pac. (2d) 577.

It seems to me clear that where, as here, there was no evidence to show that the commissioners acted in bad faith, but all the evidence shows they acted in good faith, then we must say that they are not subject to removal in the face of the legislative policy declared in section 11702 and in consequence that the order of removal was arbitrary and cannot stand. The majority opinion places reliance upon the cases of *State*

*ex rel. Rowe* v. *District Court,* 44 Mont. 318, 325, 119 Pac. 1103, Ann. Cas. 1913B, 396, and upon *State ex rel. Wynne* v. *Examining & Trial Board,* 43 Mont. 389, 399, 117 Pac. 77, Ann. Cas. 1912C, 143, as sustaining the contention that good faith on the part of the commissioners is no defense. Those cases were decided prior to the amendment of section 11702. It was because of those decisions that the legislature amended section 11702 to permit good faith, honest mistake, and value of the services to be received. Finally the majority take the position that this court has no right to interfere with the discretion of the Governor. The difficulty here is that unless there was some evidence of bad faith or a want of good faith there was nothing to move the discretion of the Governor. It seems that the majority take the view that the Governor can do no wrong, cognizable by the court. They rely strongly upon the case ·of *Wilcox* v. *People,* 90 Ill. 186. This case was before this court in the case of *State ex rel. Nagle* v. *Sullivan,* supra. I quoted from it in my dissenting opinion in that case and tried to persuade the court to approve of the doctrine of that case, but instead the court expressly repudiated it by saying: ''The decision in *Wilcox* v. *People,* 90 Ill. 186, contains language which would justify a holding that the power granted the Governor to remove a member 'for the good of the commission,' standing alone, would do away with the necessity for notice and hearing; but a reading of the opinion discloses that the court there held that, because the Constitution (Art. V, sec. 12) provided that 'the Governor shall have power to remove any officer whom he may appoint, in case of incompetency, neglect of duty, or malfeasance in office; and he may declare his office vacant, and fill the same,' neither the legislature nor the courts may dictate to the Governor in what manner he shall perform his duty. This latter declaration is grounded upon the theory, existing in some jurisdictions but not in this state, that, because the three departments of government are coordinate and independent, the courts cannot, in any case, review or control the action of the Governor.''

I agree that the courts should be slow in overturning the actions of the Chief Executive of the state. In the *Sullivan Case,* supra, I went so far as to say, as shown by my dissenting opinion in that case, that when the Governor made an order reciting that he was removing the commissioners "for the good of the commission," the court ought to take the Governor at his word. But a majority of the court in that case held that even though the Governor declared in his order of removal that he was removing the commissioners "for the good of the commission," the court was not bound by this statement and found notwithstanding this order that the removal was "for cause." While I believe that the orders of the Governor are entitled to the highest respect by the courts, I do not believe that the sacrosanctity of an order of removal of an officer by the Governor prevents this court from interfering when the removal is for cause and is without any evidence to support the order.

Here, as above stated, it was shown that similar fees have been allowed and paid to the predecessors in office of the removed commissioners. The board of examiners has approved all these and similar claims, the state has received full value in services for the fees collected, and there was no evidence in the record to contradict this showing. Under such circumstances, I think the order of removal cannot stand, and that this court not only has the right but the duty to set aside the order of removal. It seems to me illogical for this or any other court to say that a hearing is necessary before removal can be accomplished and that evidence of good faith must be heard by the Governor, and then in the next breath to say that the Governor is entitled to disregard all of the evidence in the case and enter an order of removal notwithstanding there is no evidence of a want of good faith. Such a conclusion it seems to me substitutes form for substance. It amounts to a declaration that the Governor must go through the form of a hearing and receive evidence offered by the accused, but when it comes to rendering his decision he may disregard all of the

evidence though it is undenied. To permit this to be done is tantamount to a denial of a hearing. (*Grant* v. *Michaels,* 94 Mont. 452, 23 Pac. (2d) 266.) The decided cases give finality to the Governor's order of removal only when there is some evidence to support it. Thus in 52 A. L. R. 9, the author of an exhaustive note said: "It may be said that, in general, if there is evidence to support the decision of the Governor in removing an officer, and the case for removal is one under which the Governor is authorized to act, his decision on disputed facts is conclusive." The correct doctrine has been announced by this court in the case of *State ex rel. Griffiths* v. *Mayor of Butte,* 57 Mont. 368, 188 Pac. 367, 369, where it said: "If the charges are unsupported by the evidence, or the findings are contrary to all the substantial evidence, or where the decision below has no evidence to support it, the question then becomes one of law, and the evidence may be reviewed to determine if such is the fact, but the court cannot review the evidence to determine the preponderance thereof. (3 Cyc. 348–362; *Somers* v. *Wescoat,* 66 N. J. Law, 551, 49 Atl. 462; *Kidder* v. *Townsend,* 3 Johns. (N. Y.) 435.)" To the same general effect is *State* v. *Welford,* 65 N. D. 522, 260 N. W. 593, particularly on page 601.

Finally the majority think that I cannot consistently advocate the exercise of judicial power in this case because of the dissenting opinions which I have written in certain cases cited in opposition to the action of the majority in reducing jury verdicts. Examination of the cases cited will show that in all of them that related to the question of reducing verdicts in which I participated, the question turned upon an interpretation or construction of the evidence. In all of those cases I thought the evidence, fairly construed, authorized the verdict of the jury. In none of them did I ever concede that the verdicts were "without supporting evidence" as stated in the majority opinion in this case.

For the foregoing reasons, it is my view that the order of removal should be annulled and that Commissioners Brown,

Croonenberghs, and McGregor should be declared the legal incumbents of the office of the state highway commission.

Rehearing denied March 10, 1937.